## Pincus Estate.

Argued April 19, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Arthur Littleton*, with him *William V. Suckle, John R. McConnell* and *Morgan, Lewis & Bockius,* for appellants.

*Morris Wolf,* with him *Maxwell Strawbridge, Morris H. Goldman* and *Wolf, Block, Schorr & Solis-Cohen,* for appellees.

OPINION PER CURIAM, May 25, 1954:

The decree of the Court below is affirmed on the following excerpts from the Opinion of President Judge EDWARD LEROY VAN RODEN which denied a petition for review:

"This proceeding involves a petition filed on behalf of decedent's widow and children praying that the first and final account of the executors of decedent's estate be reopened and reviewed to determine whether the executors should be surcharged for an alleged diminution in the value of certain shares of stock still held as an asset of the estate.

". . . the court finds the facts to be as follows: Decedent died November 23, 1949. By his last will and testament dated July 29, 1948, duly admitted to probate on December 2, 1949, decedent created a full marital deduction trust for the benefit of his widow, Theresa, and placed the rest of his estate in trust for the benefit of his son, Lionel, and his daughter, Shirley. He designated his nephew, Irwin Nat Pincus, and his attorney, Samuel A. Goldberg, Esquire, as executors, trustees and guardians, with the further provision that when Lionel should attain his majority, he was to become co-executor and co-trustee. At the time of decedent's death, Lionel was not quite 19 years of age. Accordingly, the other two executors took over the administration of the estate, but from time to time they consulted with Lionel, whose opinion and business acumen they apparently respected.

"At the time of his death, decedent was the owner of 1580 shares of the corporate stock of Pincus Bros., Inc., a men's clothing manufacturing concern. The said corporation had a total of 6328 issued and outstanding shares of stock at the time of decedent's death, of which 2270 shares were held by Jacob Pincus, another brother of decedent (being the father of Irwin Nat Pincus, co-executor and co-trustee). Thus, decedent had approximately a 25% interest in said corporate stock and each of his brothers had approximately 36% interest therein.

"In addition to the manufacturing corporation, the three Pincus brothers owned substantially all the common stock of certain stores which were engaged in the retail selling of men's clothing in various cities. The brothers also owned certain real estate holdings, each having approximately a one-third interest therein. Thus, the three brothers participated in three businesses, to wit, the manufacturing business, the retail

business and the real estate business, and each brother (either directly or by means of a family trust which he controlled) had approximately a one-third interest in each of the three businesses, and no brother had a controlling interest in any of the three businesses.

"On June 13, 1946, being more than three years prior to decedent's death and more than two years prior to the execution of his will, the three Pincus brothers entered into a written agreement restricting the sale or transfer of stock of Pincus Bros., Inc., except among the brothers, their immediate families, and trusts for members of their families.

"On October 9, 1950, about ten months after decedent's death, Nathan and Jacob M. Pincus entered into certain written agreements for the exchange of certain shares of the manufacturing corporation and shares of the retail stores companies, as a result of which Nathan acquired the controlling interest in the manufacturing corporation and Jacob M. acquired the controlling interest in the retail stores. The trustees of various trusts for the benefit of members of each of their families likewise participated in the said stock exchanges. Irwin Nat Pincus (being the son of Nathan Pincus as well as executor and trustee under decedent's will, as aforesaid was also a trustee and beneficiary of a trust established by his father, and in such capacity entered into the stock exchange transaction on October 9, 1950. Notice of the agreements was sent to all parties in interest, including the present petitioners.

"On March 14, 1951, the executors filed their first and final account, which was duly audited and confirmed by adjudication dated May 31, 1951. Lionel came of age on March 2, 1952, and in July of that year, he and his mother and sister complained about the stock exchange transaction of October 9, 1950.

"The executors filed their schedule of distribution on February 21, 1953, and on February 26, 1953, the present petition to reopen and review the adjudication was filed.

"The gravamen of the present complaint of the petitioners is that Irwin Nat Pincus violated his duty of loyalty to the beneficiaries of decedent's estate in that he personally benefitted by the stock exchange transactions, both as manager of the business and as beneficiary of the trust created by his father, and at the same time caused a corresponding detriment to the beneficiaries of decedent's estate of which he was executor and trustee in that said beneficiaries were relegated to the position of a minority corporate interest without any possibility of combining with any other interest to acquire control of the corporation. In other words, although decedent never had a controlling interest in the manufacturing corporation, he had the theoretical possibility of combining with either one of his brothers and thereby exert control by their combined two-thirds majority vote. Petitioners complain that the transfer of Jacob's interest to Nathan has foreclosed the possibility of the Henry interest participating in any combination capable of exercising control, and that as a consequence thereof, Henry's shares have declined in value to the extent of at least 30%, with the further possibility that the market for such shares has been thereby totally destroyed.

"With respect to the other executor, Samuel A. Goldberg, Esquire, the complaint is that he made no effort to prevent the execution of the stock exchange agreements by or with Nat Pincus but, on the contrary, facilitated it, and that he knew or should have known that these agreements were detrimental to the best interests of the beneficiaries of decedent's estate.

"Our first inquiry must be directed to the scope of permissible review of an adjudication. The Fiduciaries Act of 1949 (Act of April 18, 1949, P. L. 512 § 721, 20 PS § 320.721) provides that, 'If any party in interest shall, within five years after the final confirmation of any account of a personal representative, file a petition to review any part of the account, or of an auditor's report, or of the adjudication, or of any decree of distribution, setting forth specifically alleged errors therein, the court shall give such relief as equity and justice shall require'.

"It has been well settled, however, by judicial interpretation of Section 48 of the Fiduciaries Act of 1917, replaced by the above quoted Section 721 of the 1949 Act, that 'such review will be granted as of right only (1) where there are errors of law appearing upon the face of the record; (2) where new matter has arisen since the confirmation of the account or decree; (3) where justice and equity require a review and no person will suffer thereby'. Osterling's Estate, 337 Pa. 225, 227-228 (1940), cert. den. 309 U. S. 689, 60 S. Ct. 892 (1940).

"None of these factors is present in the instant case. No error of law appearing on the face of the record has been called to the attention of the court. The only new matter alleged to have arisen since the confirmation of the account in question is the rather belated discovery by the petitioners of the nature and extent of the legal financial consequences of the stock exchange transactions. Each of the petitioners had actual notice of the said stock exchange transactions at least five months prior to the filing of the executors' first and final account. Ordinary diligence on the part of the petitioners at the time of the audit of the executors' account would have required that their complaint should have been made then and there rather

than to defer the filing of such complaint for a period of almost two years after the adjudication became final. At the time of audit, all the petitioners were in possession of the same facts which they now allege. Each knew of the respective stock holdings of the decedent, the brothers and the various family trusts. Likewise, each knew of the identity of each of the fiduciaries involved and the extent to which their individual interests and fiduciary obligations overlapped. The present petition seeks in effect to accomplish the filing, nunc pro tunc, of exceptions which could have been filed at the time of audit. It was never intended that the statutory proceeding for review of an adjudication should be employed merely as a device to accomplish the belated filing of exceptions. Wartman's Estate, 11 W. N. C. 403 (1882). 'The aim of the law is to give finality to the adjudication of the accounts of fiduciaries.' Remick, Pa. Orphans' Court Practice, Vol. 1, § 160, p. 464; and see Gottschalk's Estate, 344 Pa. 135 (1942).

"Thus, it seems readily apparent with respect to decedent's widow and daughter, both of whom were of age and sui juris at the time of the audit and adjudication, that whatever rights they may have had with respect to questioning the stock exchange transactions were lost by their own inaction, and . . . bar them from equitable relief in this proceeding.

"With respect to decedent's son, the situation is different in that he was yet a minor at the time of audit and adjudication of the executors' account, although he was then over 20 years of age. It is strenuously argued by the respondents that because of Lionel's unusual intellectual attainments and business abilities, he should not be permitted to take advantage of the plea of infancy. With this position, the court cannot agree. A person is not sui juris at any age less than

21 full years, regardless of his physique, mentality, education, experience or accomplishments. Inasmuch as the said minor was not represented at the time of audit by independent counsel or by any guardian other than the testamentary guardians designated in decedent's will, being the executors and trustees concerning whose actions the said late minor now complains, and inasmuch as the said late minor filed his exceptions promptly upon attaining his majority, this court cannot in good conscience refuse him his day in court. Accordingly, we shall proceed to the merits of the controversy.

"We have here a situation where the decedent designated in his will as an executor of his estate, and one of the trustees of the trust created by said will and also one of the guardians of any minor beneficiaries, his nephew, Irwin Nat Pincus, whom decedent knew to be an active participant in the corporate management of the manufacturing concern in which decedent held approximately 25% stock interest. Decedent likewise knew that although the said Irwin Nat Pincus did not individually own any shares of the said corporation, his father, Nathan Pincus owned 36% of that stock. He further knew that the said Irwin Nat Pincus was co-trustee of a trust created by said Nathan Pincus, which said trust res included certain shares of the retail stores companies and also a one-third interest in certain real estate in which decedent was likewise interested. Furthermore, when decedent executed his will, he was fully aware of the provisions and implications of the written agreement dated June 13, 1946, wherein the three Pincus brothers restricted the sale of their shares of stock in the corporation, but specifically permitted any of the brothers to sell to the others or to trusts established by the others and their families. Thus, although there may have been a con-

flict of interest, such conflict was created by the decedent's will and such possible conflict was fully cognizable by the decedent when he wrote his will. Under such circumstances, the evidence of the conflict of interest would not ipso facto disqualify Irwin Nat Pincus from acting as he did in connection with the stock transfers now questioned. *Flagg Estate,* 365 Pa. 82, 88 (1950).* In order to effect such disqualification, bad faith on the part of the fiduciary must be affirmatively shown. 'Testamentary provisions must be given effect notwithstanding the existence of the self-dealing rule.' Ibid., at p. 92.**

"There is not a scintilla of evidence in the instant case which could possibly be construed as establishing bad faith on the part of Irwin Nat Pincus. Decedent was possessed at the time of his death of a minority stock interest in the manufacturing corporation. The estate still owns the same quantum of stock interest therein. Being a close corporation, a minority stock interest is not readily marketable, and there is no competent evidence in this case that this particular stock could have more readily sold prior to the above-mentioned stock exchanges than at the present time. In either case, any prospective purchaser would be wary of the majority shareholders potential for absolute control. Such majority control is now definitely centered in the hands of Nathan Pincus rather than in the combined hands of Jacob and Nathan. But the fatal flaw in the syllogistic reasoning of the petitioners is that the estate's theoretical ability to unite with either the Nathan interest against the Jacob interest,

---

* See also *Steele Estate,* 377 Pa. 250, 103 A. 2d 409.

** Neither *Flagg's Estate* nor *Steele Estate* relieve a trustee of the duty of acting with fidelity toward and with reasonable care and prudence for the trust estate.

or with the Jacob interest against the Nathan interest, and thus participate in majority control, never progressed beyond the realm of theoretical speculation. There is no evidence whatsoever that either Nathan or Jacob were at any time obligated, or willing, or even interested in exploring the possibility of acquiring the decedent's stock interest, whether by purchase of 'locked-vote' agreement or otherwise.

"The court concludes, therefore, that Irwin Nat Pincus at all times manifested good faith in the execution of the duties imposed upon him by decedent's will, and likewise manifested good faith in respect to all of his dealings with the beneficiaries under decedent's will; that he did not consciously act to the detriment of any of the said beneficiaries, nor has any such detriment been proven in fact.

"The conflict of interest was created by the decedent with full awareness of the implications and potential results thereof. The transfer of decedent's stock interest in the manufacturing concern to one of his brothers or to one of the family trusts is not prohibited by the will, but on the contrary is expressly authorized by the written agreement which antedated the will. The resulting conflict of interest on the part of Irwin Nat Pincus is only the natural and probable consequence of the situation created by the decedent himself, and cannot be attributed to any desire or motive on the part of Irwin Nat Pincus to aggrandize his own financial interest or because of his father or family trust at the expense of the beneficiaries of decedent's estate. Accordingly, the said Irwin Nat Pincus cannot be compelled to rescind the said stock exchange transactions nor is he liable to surcharge for having entered into such transactions.

"With respect to the other respondent, Samuel Goldberg, Esquire, whom decedent designated in his

will as co-executor, co-trustee and guardian of minor beneficiaries, it is clear beyond doubt that decedent knew at the time he wrote his will that Mr. Goldberg was a member of the law firm of Wolf, Bloch, Schorr & Solis-Cohen, who were the attorneys for the manufacturing corporation as well as for the other Pincus interests. Thus, it is obvious that decedent was aware of a possible conflict of interest by reason of diverse loyalty obligations, but nevertheless had full confidence in the judgment, discretion and integrity of Mr. Goldberg and also was confident that Mr. Goldberg would not deliberately act to the detriment of any of the beneficiaries named in decedent's will nor would he knowingly permit his co-trustee, or his law firm, or any other party in interest to act in such manner. The evidence discloses that decedent's confidence in Mr. Goldberg was well justified and that the latter took every reasonable step to protect and promote the interests of decedent's beneficiaries. Under the circumstances disclosed by the evidence in this case, there is not the slightest basis for adverse criticism of Mr. Goldberg professionally or as fiduciary, and the petitioners' request to have a surcharge imposed upon him is utterly devoid of merit. . . ."

Costs to be paid by appellants.