# BERNARD RUBIN ET AL. v. EDYTHE R. GOLDMAN

[No. 300, September Term, 1980.]

*Decided March 4, 1981.*

60

The cause was argued before GILBERT, C. J., and MELVIN and MASON, JJ.

*Allan H. Fisher, Jr.,* with whom was *H. Dean Bouland* on the brief, for appellants Greenberg, Rubin, Silber et al. *Benjamin Lipsitz* for appellants Bernard and Seymour Rubin, Greenberg, Morrow et al.

*Thomas Waxter, Jr.,* and *Nora Winay,* with whom were *Lynn Wintriss* and *Semmes, Bowen & Semmes* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

This case concerns the administration of the estate of Max Rubin who died testate on September 18, 1973, a resident of Baltimore County. He was survived by five adult children: two sons (Bernard Rubin and Seymour H. Rubin) and three daughters (Edythe R. Goldman, Mildred R. Greenberg and Pearl Morrow). By Item XV of his will, dated March 23, 1971, the decedent designated his two sons, Bernard and Seymour, and "my son-in-law Mannes F. Greenberg [husband of Mildred R. Greenberg], and my accountant. and advisor, Samuel L. Silber," as personal representatives of his estate. These same persons together with Lee Morrow (husband of Pearl Morrow) were named trustees of a trust created by Item VIII of the will for the benefit of Bernard Rubin and Pearl Morrow. The appellee is the oldest daughter, Edythe R. Goldman. Arrayed against her as appellants are her four brothers and sisters and the personal representatives and trustees of the testamentary trust.[1]

---

* Note: *Certiorari* granted, Court of Appeals of Maryland, June 30, 1981.

1. Also named as appellants in this Court are Mannes F. Greenberg and Samuel L. Silber in their individual capacities as "aggrieved persons having a direct interest in the subject matter in litigation." Because they were not parties, as individuals, in the action below, we question their right to appeal here; however, that issue is not raised by appellee and has no bearing on our disposition of the case.

# I

The decedent's estate, consisting mainly of stocks and securities, was valued at approximately $575,000 at the time of his death. A principal asset was 5900 shares (out of a total of 6800) of common capital stock in a family corporation, Max Rubin Industries, Inc. (MRI), engaged in the manufacture and sale of men's clothing. The balance of 900 shares was owned as follows: 400 shares by decedent's oldest son Bernard; 400 shares by decedent's son-in-law Lee Morrow; and 100 shares by decedent's son-in-law Mannes Greenberg. Mr. Greenberg was counsel for MRI both before and after the decedent's death and, together with Samuel Silber, acted as counsel for the personal representatives in the administration of the estate.

By Item VIII of his will, the decedent left his 5900 shares of MRI stock together with the common stock of small affiliate corporations of MRI in trust for the benefit of his oldest son Bernard and his daughter Pearl Morrow (wife of Lee Morrow). Sixty per cent of the stock was to be held for Bernard and 40% for Pearl. No other bequest was made to the trust, so that the principal of the trust consisted entirely of stock in the family business. The bequest to the trust was "subject, however, to the charge made in Item I" of the will. Item I of the will directed the personal representatives to pay out of the principal of the trust "all estate and inheritance taxes," "burial expenses" and "administration expenses." As we shall see, this is the provision that spawned the main controversy between the appellee, Edythe Goldman, on one side and all the other interested parties on the other.

The will provided for certain other specific bequests in cash and kind to various charitable institutions and relatives of the decedent, including appellee, Edythe Goldman. A handwritten codicil to the will also provided for an annuity to Edythe of $100 per week for ten years.

The residuary estate was left to the five children in equal shares, except that Seymour Rubin, who was a successful doctor, was to receive a 1/9th share and the other four children a 2/9th share.

In July 1978, the personal representatives filed in the Orphans' Court of Baltimore County their Fifth and Final Administration Account and petitions to fix commissions and attorneys' fees. One of the decedent's children, Edythe Goldman, the appellee, filed exceptions to the Account and objections to the petitions for commissions and attorneys' fees. The personal representatives and trustees of the testamentary trust, joined by the decedent's other four children in their individual capacities, then filed a bill of complaint in the Circuit Court for Baltimore County against the appellee requesting the court to assume jurisdiction over the further administration of the estate and the parties. The purpose of the action was to have the court declare 1) that the estate was being properly administered; 2) that the appellee be declared to have breached a May 1974 agreement with her brothers and sisters and that she be required to repay the estate $25,200 paid to her by the personal representatives pursuant to the terms of a codicil to decedent's will that was the subject matter of the agreement; 3) that the court approve the commissions and attorneys' fees; and 4) that plaintiffs' counsel in the equity proceedings be paid a reasonable fee from the decedent's estate.

The appellee answered the bill of complaint and filed a counter-claim. In essence, she alleged that the estate was not being properly administered; that "most of the Plaintiffs in this case are wallowing in a morass of conflicts of interest"; that the residuary legatees, of which she is one, have been "illegally and improperly charged" with the payment of estate taxes and expenses in violation of the provisions of the decedent's will; and that she had not breached the May 1974 agreement and was entitled to continued payments under the codicil.

After four days of trial in December, 1979, the chancellor, by order filed on February 1, 1980, ordered and adjudged that the terms of the codicil that was the subject matter of the May 1974 agreement be carried out; that appellee's share of the residuary estate be paid to her in cash ($45,111.10); that the counsel fees and commissions requested by the personal representatives were fair and rea-

sonable "and are otherwise allowable" but only to the extent there is cash available in the estate after the ordered payments to the appellee; that the fees and expenses of this litigation be paid by the personal representatives and not out of the estate; and that the Fifth and Final Administration Account "be accepted and approved when amended to reflect the directions contained in this Order." In their appeal to this Court, the appellants challenge all of these rulings.

While the parties state them somewhat differently, we think the case presents the following issues:

A. Did the Chancellor err in requiring the personal representatives to pay appellee the annuity provided by the codicil?

B. Did the chancellor err in not declaring that the May 1974 agreement precluded appellee from contesting the stock redemption plan?

C. Did the chancellor err in setting aside the stock redemption plan for the distribution to appellee of her share of the residuary estate?

D. Did the chancellor err in his ruling concerning counsel fees and commissions?

We now consider these issues seriatim.

## II

### A

The decedent's will was duly admitted to probate on October 16, 1973. Although the handwritten codicil had been submitted for probate simultaneously with the will, it was not admitted to probate at that time. Apparently, the other four children objected to it because of alleged deficiencies in its publication. In May, 1974, however, an agreement was signed by the warring parties, whereby Edythe's brothers and sisters agreed "to withdraw any objec-

tion they have to the admission to probate" of the codicil and Edythe agreed

"that (i) *she will not contest nor oppose in any manner the decision of a majority in interest of the stockholders of any family corporation* in which she owns capital stock acquired or to be acquired, directly or indirectly, and from her late father, Max Rubin, by gift, devise, bequest or otherwise; and (ii) *to vote any such capital stock in accordance with the wishes of a majority in interest, of the stockholders of any such corporation where more than a majority in interest is required for any corporate act."* (Emphasis supplied.)

The Orphans' Court then admitted the codicil to probate on May 14, 1974. The codicil, in the handwriting of the decedent, is an obvious attempt on his part to explain to his children why he left the bulk of his estate to his oldest son Bernard and his daughter Pearl Morrow. He also expressed concern over Edythe's relatively poor financial condition and manifested that concern by providing in the codicil that Edythe was to receive an additional bequest in the form of an annuity. In pertinent part the codicil reads as follows:

"After many months of soul searching I feel, I have perhaps not distributed fairly my estate and some amends should be made, so my conscience would be clear and love and warm feeling to exist after my demise, no feelings of unfairness.

(1) I left the bulk of my estate to my son Bernie Rubin. He worked hard and helped me build up my business.

He knows no other trade nor profession has a family and this is the only way he can make a living. He worked hard, conscientious, devoted. Should the property be divided I fear he would be left at the mercy of others, perhaps the property divided and business destroyed. He would then be the greatest sufferer.

My conscience would suffer. This is his livelihood. This is the only business he knows.

(2) My next son, Dr. Seymour H. Rubin, now a physician with a good income, I believe does not need my assistance, nor does he need additional income. To him I leave my love and best wishes. Same to his family. I feel sure he being a fine conscientious man will not feel deprived but be grateful that I will contribute to his brother and his sisters. I hope he will continue to prosper and contribute his talents and fine disposition to helping mankind. I am sure he will agree with my decision. He does not need my help.

(3) My daughter, Pearl, will get the next biggest share. Pearl and Lee will have a goodly share, a business Lee can devote his time diligently and make the business grow. Pearl thought the business should be divided equal between Lee and Bernie. According to Jewish law a son (Bernie) is entitled to receive the biggest share. Bernie has been with me longer and I believe he worked harder and understands the business better. So Pearl should consider herself lucky and adjust her thinking and be grateful to me. She will get the lions share of a business I worked hard to build.

(4) Next is Millie (Mrs. Mannes Greenberg). Mannes thank God is now a successful attorney loved by me and everyone else. She is well provided. Thank God, I feel she does not need my help. Millie is a fine lady broadminded. I feel sure she will be satisfied with my decision and carry on an everlasting love and fond memory of me. I pray she will understand me.

(5) Next is my dearly beloved daughter, Edith. My pride and joy. I am worried. At the present time her income is perhaps the smallest. For a long time she thought my estate should be divided between all five children alike. If I would do that the business would sooner or later be sold or destroyed.

Sooner or later there would be nothing left. And Bernie and Lee (Pearl) would be the greatest sufferers because the clothing business is all they know and once a business is destroyed at this age it would be hard to get started. And so to help out my beloved daughter, Edith, this decision should be carried out faithfully as my will and as a part of my last will. Nothing else shall be changed. Other wills to remain in force as written addition to be made as follows:

> (a) My daughter, Edith Goldman, to receive one month after my demise a weekly payment of $100.00 per week (One Hundred Dollars) and each week after $100.00 (for ten (10) years hereafter) from the business or estate left. In addition to other bequests left in my will and codicils. In other words, this $100.00 weekly payment shall be in addition to other bequests already stipulated in wills of previous dates."

Shortly after the codicil was admitted to probate the personal representatives began the $100 weekly payments to Edythe and continued them until Edythe filed exceptions to the Fifth and Final Administration Account on August 16, 1978. The appellants contend that Edythe's exceptions, in which she challenged the proposed distribution, constituted a breach of her agreement of May, 1974, not to "contest nor oppose in any manner the decision of a majority in interest of the stockholders of any family corporation." The personal representatives therefore argue that they were justified in discontinuing the annuity payments called for by the codicil. In addition, the appellants claim that Edythe should be required to repay the estate the annuity payments already received by her ($25,200).

The chancellor ruled that, "the law does not recognize a conditional probate, and once the codicil was accepted for probate by the Orphans' Court, the personal representatives could not fail to honor its provisions." Consequently, by a portion of the February 1, 1980 Order appealed from, he

ordered the personal representatives to pay Edythe all monies due her under the codicil, together with interest from the date payments became due. We are not disposed to disturb that portion of the February 1, 1980 Order. Once a will, including a codicil as a part thereof, has been admitted to probate, unless probate is subsequently revoked, it is the general duty of the personal representatives "to settle and *distribute the estate* of the decedent *in accordance with the terms of the will* and the estates of decedents law as expeditiously and with as little sacrifice of value as is reasonable under the circumstances." (Emphasis added). Md. Code (1974), § 7-101, Estates and Trusts Article. The fact that others may have agreed not to oppose probate, for whatever reason or consideration, does not change this duty. In the present case, appellants do not question the validity of the codicil or otherwise contend that it should not have been admitted to probate. Under these circumstances, we find no basis for holding that the chancellor erred in requiring that its provisions be carried out. To hold otherwise would be to thwart the intention of the testator.

B

Appellants contend that the May 1974 Agreement, in which Edythe agreed "not to contest or oppose in any manner the decision of a majority in interest of the stockholders of any family corporation . . .," foreclosed her right to object to the manner in which the personal representatives proposed to distribute the residuary estate. The Fifth and Final Administration Account proposed to distribute to the residuary legatees their respective shares in a promissory note executed by the family corporation (MRI) payable to the "Estate of Max Rubin," in the sum of $203,000. The note was given to the estate as payment for the redemption of 5170 of the 5900 shares of the MRI stock owned by the decedent at the time of his death, pursuant to an agreement dated September 1, 1977, between MRI and the personal representatives and the testamentary trustees. Because "a majority in interest of the stockholders" of MRI

had agreed to the redemption plan, appellants argue that Edythe was foreclosed from objecting to it and her action in filing exceptions to the account challenging the propriety of the redemption plan constituted a breach of her May 1974 agreement, and the chancellor should have so declared.

In his Memorandum Opinion the chancellor "declare[d] that the filing by Edythe, a residuary legatee, of Exceptions to the fifth and final administration account, does not constitute a breach of the May 1974 agreement, pursuant to which objections to the probate of the codicil was withdrawn" and that the agreement "cannot be properly construed as prohibiting Edythe from mounting an attack on the actions of the personal representatives in their administration of the estate." In the order of February 1, 1980, from which this appeal was taken, the chancellor made no mention of these matters, i.e., he did not declare one way or the other whether Edythe was precluded from objecting to the redemption plan or whether she breached the 1974 Agreement. Appellants claim this was error. In the context of the proceedings before the chancellor we see no error.

The proceedings below were initiated by the appellants pursuant to the Maryland Uniform Declaratory Judgments Act (Md. Code, 1974, Courts Article §§ 3-401 to 3-415, incl.). The bill of complaint fully recited what the personal representatives had done with respect to the stock redemption plan and why they had done it. The bill also set forth the "antagonistic claims by the Defendant with regard to the administration of the Estate, and particularly the ... redemption plan." The bill also set forth the personal representatives' action with regard to the codicil annuity for Edythe. The appellants asked the court to assume jurisdiction over the administration of the decedent's estate and to declare that the estate was being properly administered and to approve the Fifth and Final Administration Account.

In their prayers for relief, the appellants did ask the court to declare that Edythe had breached the May 1974 Agreement, but only as a justification for their cessation of the annuity payments and as a basis for their claim that

Edythe should repay the amounts already paid her. Among the prayers for relief was the following:

> "c. That this Court declare that Defendant, EDYTHE RUBIN GOLDMAN, has violated the May 1974 Agreement ... for the reasons set forth in Paragraph 15 and other paragraphs of this Bill of Complaint and that she be required to repay to the Estate the sum of $25,200.00 heretofore paid to her thereunder with legal interest."

As we have already indicated, in the absence of any challenge to the validity of the codicil or its probate, the personal representatives were bound to carry out its provisions. Whether or not Edythe breached her agreement not to oppose "the decision of a majority in interest of the stockholders" of the family corporation did not justify a unilateral disregard of the codicil.

No other specific prayer for relief mentioned the May 1974 Agreement or asked any other declaration with respect to the effect of any alleged breach. In seeking approval of the stock redemption plan, the appellants did not allege, nor do they argue here, that it should be approved simply because Edythe agreed not to oppose it. Rather, they alleged that the stock redemption plan "constitutes a sound, practical and workable solution (a) for the Estate, the beneficiaries, Max Rubin Industries, Inc., and the other business entities in which the Estate is interested; and (b) for the implementation of the Decedent's expressed intent to protect his business as well as his beneficiaries." *"Accordingly,"* they alleged, "there is no justification for Defendant's [Edythe's] challenges to the ... redemption plan...." (Emphasis added). Although it was further alleged that Edythe had breached the agreement "and that she should be required to repay the Estate all weekly payments (totalling $25,200) heretofore paid" under the codicil, there was no prayer for a declaration that because of the alleged breach she should be precluded from contesting the appellants' allegation that the redemption plan is "a sound, practicable and workable solution...." On the contrary, by initiating the proceedings

below and naming Edythe as the sole defendant, the appellants invited such a contest.

We conclude that in the context of the proceedings below whether or not Edythe breached the May 1974 Agreement (even assuming that it could be interpreted as an agreement not to oppose the personal representatives' proposed method of distributing the residuary estate) was an issue that need not have been decided by the chancellor and needs no resolution by us. The sole all-encompassing issue presented to the chancellor was whether the personal representatives were properly administering the estate, with particular reference to the codicil, the stock redemption plan, counsel fees and commissions. Whether or not Edythe may have breached an agreement not to oppose the majority of the family stockholders certainly is not determinative of that issue.

For the foregoing reasons we perceive no error in the chancellor's failure to declare that Edythe had breached the May 1974 Agreement or that she was precluded by the agreement from contesting the proposed distribution of her share of the residuary estate.

## C

We now come to the principal issue in this case, *i.e.,* whether the chancellor erred in directing that appellee's share of the residuary estate be paid to her in cash ($45,111.10), rather than, as the personal representatives proposed, by a promissory note under the terms of which the appellee would receive 6% interest but no principle payments for ten years.

As mentioned earlier, the decedent's will directed that all taxes, administration expenses, and burial expenses be paid "out of the principal of the Trust created under Item VIII" of the will. The taxes and expenses totalled $203,000, including approximately $147,000 in federal and state taxes. The personal representatives had initially paid the bulk of the $203,000 from cash in the estate and not from the Item VIII Trust as directed by the decedent's will. If the $203,000 were

paid from the trust, that amount of cash would then have been part of the residuary estate and payable to the residuary legatees.

The personal representatives were well aware, of course, of the testator's intention that all his bequests, except those to the Item VIII trust, were to be "free and clear" of all taxes and expenses of administration. It therefore behooved them to see to it that the trust principal ultimately bore the burden of paying the $203,000. They were also aware of the testator's desire, clearly expressed in the codicil, that the family business be continued under the control of the testamentary trustees for the benefit of his oldest son, Bernard, and his daughter, Pearl Morrow, whose husband, Lee Morrow, together with Bernard, were the only family members actively involved in the business and both of whom completely depended on the business for their livelihoods. The testator noted in the codicil that even though Edythe, his "pride and joy," thought my estate should be divided between all five children alike . . .[,]

"[i]f I would do that the business would sooner or later be sold or destroyed. Sooner or later there would be nothing left. And Bernie and Lee (Pearl) would be the greatest sufferers because the clothing business is all they know and once a business is destroyed at this age [2] it would be hard to get started. . . ."

The appellee does not contend that the personal representatives should not have initially used the cash in the estate to pay the taxes and expenses as they became due. She appears to recognize, as did the chancellor, that this was proper. What she objected to was the method they devised for placing the ultimate burden upon the trust, as directed by the testator, and that in devising that method they were "wallowing in a morass of conflict of interests . . . such as to void their actions."

---

**2.** At the time of the trial below, all the decedent's children were in their fifties; Edythe, the oldest child was 59 years old.

The personal representatives were faced with a difficult task. The book value of the MRI stock held by the estate and destined for the trust was less than the needed $203,000. Moreover, there was no market for the stock. Besides that, a sale to outsiders would have thwarted the testator's intention that the business be maintained under the control of the testamentary trustees for the benefit of his oldest son, Bernard, and his daughter Pearl Morrow. As stated by the chancellor in his Memorandum Opinion, "the personal representatives were on the horns of a dilemma. They had to pay the taxes in cash. They had to exonerate the residuary legatees from the taxes and expense burden. They had to thrust that burden on the stock of the family corporation. At the same time, they had to preserve the corporation as a going business."

The personal representatives decided to solve the dilemma by effecting a stock redemption plan under Section 303 of the Internal Revenue Code.[3] The plan, apparently approved by IRS, was agreed upon by the personal representatives and directors of MRI on August 31, 1977. A written agreement embodying the plan was signed by the corporation and the personal representatives on September 1, 1977. The agreement was also signed by the testamentary trustees. On April 26, 1978, the plan was fully described at a meeting of the corporate stockholders. The meeting was attended by all stockholders except Edythe (who owned some preferred stock). Her son, Brian Goldman, who is a young attorney, was present, however, and, although no formal vote was taken, neither he nor anyone else present voiced any objection to the action taken by the directors.

The stock redemption plan and the rationale behind it are described in a memorandum written by Samuel Silber after the August 31, 1977 meeting of the directors. After listing

---

**3.** The effect of a "section 303 redemption" is in certain cases to exempt from tax as a dividend the redemption price of stock included in a decedent's gross estate to the extent that the price does not exceed federal and state estate and inheritance taxes and funeral and administration expenses allowed as deductions to the estate under federal law. Sect. 303, Internal Rev. Code and Regulation § 1.303.3 (July 1979).

the items making up the $203,000, the memorandum continued:

"Under the provisions of Item I of the Last Will and Testament of Max Rubin, the foregoing items, totaling $203,000.00, are to be paid out of the principal of the Trust to be created under Item VIII of the Will.

The assets provided to pass into the Trust under Item VIII consist solely of 5,900 shares of common stock of Max Rubin Industries and 300 shares of common stock of The Old Otterbein Mft. Co. It is to these companies we will have to look to provide funds with which to reimburse the $203,000.00 noted above. At this time these companies are without adequate funds or resources to fund a redemption of stock for this purpose.

In order to close the estate, the personal representatives decided that the Trust would satisfy this obligation by arranging to have Max Rubin Industries issue a note to the estate in the amount of $203,000.00, in redemption of a substantial portion of its common stock. The note would thereafter be distributed to the beneficiaries, in accordance with Item X of the Will.

The common stock of Max Rubin Industries is held as follows:

|  | No. of Shares | % |
| --- | --- | --- |
| Estate of Max Rubin | 5,900 | 86.77% |
| Bernard Rubin | 400 | 5.88% |
| Lee Morrow | 400 | 5.88% |
| Mannes Greenberg | 100 | 1.47% |
|  | 6,800 | 100.00% |

The net book value of the common stock of Max Rubin Industries (which includes the book value of its wholly-owned subsidiaries, Millburn Mfg. Co., Inc. and Redwood-Greene Mfg. Co., Inc.) as of June

30, 1977, totaled $231,684.62, or $34.071 per common share (based on 6,800 shares outstanding).

If we were to redeem the shares held by the estate on the basis of the existing common stock outstanding as set forth above, we would encounter two problems: (1) the book value of common stock held by the estate is less than the amount of the note, and (2) control of the corporation would pass from the Trust to the individuals which would effectively thwart the intentions of the testator.

Accordingly, it was decided that Bernie, Lee and Mannes would contribute common stock to the corporation in the same ratio as that redeemed by the estate, so that the same percentage of ownership would be maintained after the redemption as existed immediately prior to the redemption.

Thus, to accomplish the foregoing, the total number of shares requested to be redeemed by the corporation is 5,958 shares (5,958 shares at 34.071 = approximately $203,000.00) and the number of shares to be contributed by the individuals as follows:

|  | No. of Shares | % |
| --- | --- | --- |
| Estate of Max Rubin | 5,170 | 86.78% |
| Bernard Rubin | 350 | 5.87% |
| Lee Morrow | 350 | 5.87% |
| Mannes Greenberg | 88 | 1.48% |
|  | 5,958 | 100.00% |

After the above transaction, there will be 842 shares of common stock outstanding, issued in the following names:

|                         | No. of Shares | %       |
|-------------------------|---------------|---------|
| Trust u/w Max Rubin     | 730           | 86.70%  |
| Bernard Rubin           | 50            | 5.94%   |
| Lee Morrow              | 50            | 5.94%   |
| Mannes Greenberg        | 12            | 1.42%   |
|                         | 842           | 100.00% |

After the foregoing is accomplished, which will be prior to September 15, 1977, the appropriate petitions will be prepared for filing with the Orphans' Court, with notice to all interested parties, and the note will be issued to the estate."

The reason for the deferred payment provisions of the note is explained in a recital of the September 1, 1977 agreement between MRI and the personal representatives.

"WHEREAS, the Corporation is unable to pay as of the current time any sum in redemption of its common stock, but in order to prevent any disruption to its operations and also to fulfill the intentions of the Decedent, has agreed to redeem 5,170 shares of the common stock of the Corporation held by the Decedent at the time of his death for an aggregate price of $203,000.00, provided that the obligation to pay the purchase price shall be represented by a subordinated note bearing interest at the rate of six percent (6%) per annum payable, on the principal balance of the Note from time to time outstanding, and with principal payments in installments beginning at the expiration of ten (10) years from the date hereof;"

Ideally, the redemption price would have been paid to the estate in cash, in an amount sufficient to replace the decedent's cash that had been used to pay the taxes and expenses in the first place. The cash proceeds of the redemption would then have been distributed to the residuary legatees "free

and clear" of taxes and administration expenses. If this had been done, Edythe would have been satisfied, for as stated in her brief, "there is no dispute concerning the authority of directors to authorize a redemption of corporate stock. Nor is there any question that the testator and the drafters [Messrs. Greenberg and Silber] of his estate plan envisioned a stock redemption as the means by which the trust was intended to fulfill its obligation [to pay taxes and expenses]. Further, there is no quarrel with the proposition that the personal representatives were vested with the power and authority to sell the shares of the Corporation pursuant to the authorization of the trustees." What Edythe objected to was that, instead of cash, the estate received an unsecured, subordinated promissory note. She argues that in negotiating for the note the personal representatives were afflicted with a conflict of interest and that they preferred "their interests over those of Appellee."

The chancellor agreed that there was indeed a conflict of interest between the personal representatives in their fiduciary roles as trustees for the residuary legatees and their personal roles as officers and directors of the family corporation. He opined that because of the conflict the personal representatives should have "resigned their fiduciary positions and let the ultimate decision [as to how best to charge the Item VIII trust with the $203,000] be made by someone who could be completely impartial and without any possible conflicting interest." The chancellor did not, however, remove the personal representatives and appoint "impartial" replacements to make the "ultimate decision." Instead, the chancellor himself made the "ultimate decision" by directing the personal representatives to pay cash to the appellee rather than have her share, with the other residuary legatees, in the promissory note received by the estate from the family corporation. In so doing, we think he committed error and, therefore, we shall reverse that portion of the February 1, 1980 order from which this appeal has been taken.

There is no question that the chancellor was correct in finding that the personal representatives were in a conflict

of interest situation. As personal representatives they occupied a fiduciary position towards Edythe and all other beneficiaries of the decedent's will. As directors and officers of the family corporation they also occupied a fiduciary position towards the corporation. Under established principles of trust law, they owed each a duty of undivided loyalty; hence, a conflict of interest existed when the individuals named as personal representatives dealt with themselves as directors and officers of the corporation in arranging the stock redemption plan embodied in the agreement of September 1, 1977. The existence of the conflict of interest would ordinarily be enough to render voidable such an agreement as being a breach of trust, "and the question of whether or not such a position [of conflict of interest] has resulted in a benefit or loss to the beneficiary is not permitted to be inquired into." *Mangels v. Tippett,* 167 Md. 290, 300, 173 A. 191, 195 (1934).

While recognizing the general rule against fiduciaries acting in situations where there is a conflict of interest, the appellants argue that where, as in the case before us, the settlor places his fiduciaries in a position of apparent "conflict of interest," the action of the fiduciaries in exercising the discretionary powers given them by the trust instrument will be sustained notwithstanding such conflict, in the absence of bad faith, fraud, or an abuse of discretion. We are persuaded that this argument is valid, is supported by the authorities, and is dispositive of the case before us.

In *In re Flagg's Estate,* 365 Pa. 82, 73 A.2d 411 (1950) the decedent's principal asset, aside from his residence, was his stockholding in a closely held corporation. He was survived by a son who was active in the business, and a daughter who was not. He bequeathed one half of the preferred stock in the corporation and all of the common stock to his son. The remaining preferred stock was bequeathed to his son and a corporate trustee in trust for his daughter for life and upon her death in further trust for her descendants. After the distribution of the preferred stock to the trust, the board of directors of the corporation, which was controlled by the trustees, authorized the redemption of some of the preferred

shares and reinvestment of the proceeds on three occasions. Two of the redemptions precipitated court action by the daughter who urged that the mere existence of the obvious conflict of interest between the trustees and the directors should justify the court in enjoining them.

The Supreme Court of Pennsylvania, finding at the outset that the evidence showed no fraud and that the trustees acted in good faith in making the redemptions, said:

> "While the term 'self-dealing' sufficiently identifies the rule, it does not define its limitations. The rule is stated in Restatement, Trust, Section 170 (1) in the following form: 'The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary.' The appellants agree that there may be conflict of interest between them as trustees of the daughter's trust and as directors of the corporation. Both interests were created by the testator to be enjoyed as limited by his will. *The mere existence of the conflict cannot be allowed to destroy the trust because the testator had the power to specify the terms on which he bequeathed his property. . . . The testator, having the power to do so, created the conflict which became a fact or condition in the administration and devolution of his property to be observed by his executors and trustees.* This administration is subject to the scrutiny of the courts, who restrain or otherwise pass on charges of breach of trust.
>
> It is at this point in our review, that the error of the learned court below stands out. The record shows no fraud on the part of the trustees; they acted in good faith; the challenged action is within the provisions of the will. Why then, on the life tenant's exception, did the learned judge set aside the redemption of the preferred stock shown in the second account? He leaves no doubt on the subject: he states that, 'In voting for redemption, Mr. Flagg was duty bound to serve the best interests of the trust, and was also duty bound to serve the best

interests of the corporation. He could not do both at once. It is unnecessary to decide which interest he did in fact serve; the existence of the conflict of interests ipso facto disqualified him from acting. * * * Again, it is unnecessary to determine whether he was in fact influenced even to the slightest degree by any selfish motive in voting for redemption; it is the conflict of interests rather than bad faith which is the determinative factor. It seems obvious that Mr. Flagg's duty of loyalty to the trust was not undivided. * * * This court is bound to conclude, therefore, that when the trustees voted for the redemption of the preferred stock, and then surrendered the stock pursuant to such call for redemption, they were unable to consider solely the best interests of the trust. Consequently, the transaction cannot receive judicial approval.' ... *The learned judge apparently thought that opportunity to do wrong was, under this will, the equivalent of doing wrong. His conclusion that 'the existence of the . conflict of interest ipso facto disqualified him from acting' and that 'the conflict of interests rather than bad faith * * * is the determinative factor,' cannot be allowed to set aside the intention of the testator manifested in his will.*

*The will shows that the testator had the conflict in mind when he made it and left it to be one of the conditions of his testamentary dispositions to be dealt with during administration.* He knew the preferred stock was issued subject to redemption (he had the business, theretofore conducted as a partnership composed of himself and his son, incorporated in 1922) and he knew that by his bequest he was giving unrestricted voting powers in the corporation to his son who had been his partner. In the twelfth paragraph of the will he authorized his son to buy all the preferred stock at the redemption price. The conferred right to exercise all these plenary powers to ownership necessarily modified

or displaced the otherwise absolute limitation against self-dealing. *This record shows that the conflict of interest did not disqualify the trustees; it shows that they acted in good faith in what they, acting as reasonable men thought was for the best interest of the trust.* If they had acted prejudicially the court would have had something to go on." *Id.* at 87-89, 73 A.2d 414-15. (Emphasis supplied) (Footnotes omitted)

*See also, In re Steele's Estate,* 377 Pa. 250, 103 A.2d 409 (1954), and *In re Pincus' Estate,* 378 Pa. 102, 105 A.2d 82 (1954).

In *Tankersley v. Albright,* 374 F. Supp. 538 (N.D. Ill., 1974), *rev'd in part on other grounds,* 514 F.2d 956 (7th Cir. 1975), the District Court cited *Flagg, supra,* with approval. The trustees under decedent's will were also directors of the Tribune Company (Chicago Tribune) as well as executives and members of its executive committee. They instituted an action for a declaratory judgment to affirm their rights to vote shares of stock in favor of certain proposed amendments to the company's certificate of incorporation and by-laws. Two trust beneficiaries opposed the action claiming that the trustees were in a conflict of interest position. In upholding the trustees' right to vote the shares the court said:

"Defendants' conflict of interest allegation arises from the plaintiffs' dual roles as Trustees under the Trust and as executives responsible for the direction and management of the Company. Since the nature of the fiduciary relation requires the trustees to act only for the benefit of the cestuis que trustent, see e. g., In re Flagg's Estate, 365 Pa. 82, 73 A.2d 411 (1950), conflicts of interest generally are prohibited. (citations omitted). *However, this proscription is subject to modification by the settlor; the mere existence of a conflict does not ipso facto require a prohibition of the trustees' planned action where the trust instrument creates the conflict.* The McCormick-Patterson Trust clearly evidences the

settlors' intent that there be identity between Trustees and Company personnel, and the history of the Trust discloses that this objective has been realized. It is well-settled that courts will carry out the settlors' intent unless to do so would breach a 'rule of law, or good morals, or the (declared) public policy of the State.' United States Trust Co. v. Jones, 414 Ill. 265, 270, 111 N.E.2d 144, 147 (1953). The comment of the court in Conant v. Lansden, 341 Ill. App. 488, 94 N.E.2d 594 (4th Dist. 1950), aff'd in part, reversed in part on other grounds, 409 Ill. 149, 98 N.E.2d 773 (1951), indicates Illinois policy in this context:

> 'It is a common situation for a testator who owns what he deems a good business, to include it in a trust and to appoint as one of the trustees, an officer or employee who is familiar with the business. His reasons are too patent to require comment. [The testator] chose among his trustees, two men who had been officers of the company since it was originally incorporated. It would be a strange rule of law to hold that the trustees were guilty of bad faith, self-dealing, or other improper conduct if they failed to resign their corporate positions, and thus discontinue the very reason for their selection. 341 Ill.App. at 502, 94 N.E.2d at 601.'

> *Nor will '(c)ourts of equity . . . interfere with the exercise of discretionary powers of a trustee in the absence of proof of fraud, bad faith, or abuse of discretion. . . .'* Continental Nat'l Bk. v. Sever, 393 Ill. 81, 93, 65 N.E.2d 385, 391 (1946)." *Id.* at 543. (Emphasis supplied.)

Although no Maryland case has been found directly on point in which the Court of Appeals has had occasion to rule on the principle of "implied exemption from the duty of loyalty," we have been referred to the case of *Gianakos, Ex'r.*

*v. Magiros,* 238 Md. 178, 208 A.2d 718 (1964) which appears to recognize the principle. In that case it was contended that the administrator of the estate of his deceased partner was precluded, because of a conflict of interest from consenting under the Uniform Partnership Act to the continuation of the business by himself. Judge Oppenheimer, speaking for the Court of Appeals, rejected this contention:

> "By reason of this court appointment, in the absence of proof of wrongdoing, *he is authorized to take action which might, under other circumstances, constitute a conflict between his personal position and his fiduciary capacity.* He is, of course, liable under his bond as administrator for any breach of his duty in that capacity. In this case, Sophie, the wife, did not protest Thomas' appointment as administrator, and the Executor expressly disclaims any request for his removal. No intentional wrongdoing by Thomas is claimed.
>
> This case is unlike that in which a trustee voluntarily buys assets of the trust estate. Cf. *Harlan v. Lee,* 174 Md. 579, 199 A.2d 862 (1938). By virtue of his position as administrator, Thomas was put to an election under the Act. The election was necessary by reason of his position, and the position was not only under court order, but also without objection from the fiduciary during her lifetime or by her Executor after her death. The attack is made, not because that election was deleterious to George's estate, but merely because it was made. Under these circumstances, the attack must fail." (Emphasis added.)

*See, also, McDaniel v. Hughes,* 206 Md. 206, 111 A.2d 204 (1955), where in dicta the Court of Appeals, after discussing a fiduciary's duty of undivided loyalty as a prohibition against a trustee's purchase of trust property from the beneficiary, said at, 221-222:

> "As to this rule, it was said by Judge Parke in the case of *Harlan v. Lee,* 174 Md. 579, 199 A. 862: '...

> *the rule is not applicable* if the purchase be made to protect the interest of the cestuis que trustent . . . or *if the fiduciary be authorized* by statute, *by instrument creating the trust,* or by the court having jurisdiction of the subject matter, provided the sale be fairly made. 3 *Bogert on Trusts and Trustees,* sec. 484, pp. 1521, 1522; . . .' " (Emphasis added.)

The appellee relies heavily upon the cases of *Mangels v. Tippett,* 167 Md. 290, 173 A. 191 (1934), and *Schmidt v. Chambers,* 265 Md. 9, 288 A.2d 356 (1972) to support her view that the action of the personal representatives should not be allowed on conflict of interest grounds. In each of those cases the Court of Appeals condemned the actions of a testamentary trustee on conflict of interest grounds, citing the familiar rule "that a trustee, or one acting in a fiduciary capacity, is not permitted to place himself in such position that the interest of the beneficiary and his own personal interest do or may conflict. . . ." We do not believe these cases are apposite to the present case, for in each of them the challenged conduct of the trustee took place while the trustee was in a conflict of interest position that was created by the trustee and not, as in the present case, by the testator himself.

In *Mangels v. Tippett,* after the testator's death, the trustee, by reason of the trust's ownership of one half of the stock of a corporation, was elected as one of the three directors of the corporation, and was then elected the secretary of the corporation at a weekly salary. The Court held that it was not improper for the trustee to become a director but that having placed himself in that position it was improper to become a salaried officer of the corporation, a position the Court said was "dependent upon his directorship, growing out of the trustee-ownership of the stock." *Id.* at 305. The Court did not require removal of the trustee but did require him to pay to the beneficiary of the trust one half of the salary received by him as secretary, this being the amount by which the payment of the salary to him had lessened the return to the beneficiary.

In *Schmidt v. Chambers, supra,* Chambers, an attorney, was named co-executor under the decedent's will and sole trustee under his testamentary trust. Prior to the testator's death, Chambers had acted as general counsel to the Louis Company, the stock of which comprised one of the principal assets of the estate. Chambers was also a director of the company and an alternate trustee of a voting trust agreement relating to the company's stock. After the testator's death, Chambers used his fiduciary position to become vice-president and chairman of the Board of the company with substantial increases in salary over a short period of time and to acquire an option to purchase company stock at a discount. The beneficiaries of the estate complained of the manner in which Chambers was administering the estate and sought his removal, charging him with a conflict of interest between his duties as fiduciary of the estate and his newly acquired corporate positions. The Court said, "The central question is, was the stock that was voted helpful in achieving the office or salary with which the trustee became vested. The lower court thought that it was and so do we." *Id.* 37, 38. Consequently, Chambers was removed as co-executor and testamentary trustee and required to account to the estate for the emoluments he received as the result of his voting the trust-owned stock of the company. Significantly in that case, the Court found that there was no intention on the part of the testator to protect the Louis Company, "when the latter is viewed in juxtaposition with" the beneficiaries of his estate. *Id.* 37.

In the case before us, the appellee, as stated in her brief, "does not dispute the fact that in his codicil the decedent expressed his desire to have the family business preserved for the well being of Bernard Rubin and Pearl and Lee Morrow. . . ." The personal representatives here (unlike the fiduciaries in *Mangels* and *Schmidt)* in carrying out their decedent's desires did nothing to improve their position with the family business after his death. On the contrary, two of them, Bernard Rubin and Mannes Greenberg, together with Lee Morrow (one of the trustees of the Item VIII trust), surrendered a portion of their company stock, without con-

sideration, and approved a redemption plan imposing a $203,000 obligation on the business. As a result of their actions, the testator's intentions with respect to both preserving the business and paying the taxes and administration expenses are able to be fulfilled, albeit not as quickly as the appellee thinks they should be.

As already indicated, the appellee concedes that the personal representatives had full authority under the decedent's will to approve a redemption of the stock. She also concedes that it was the testator's intention that this be done "as the means by which the [Item VIII] trust was intended to fulfill its obligation [to pay the taxes and administration expenses]." Obviously, in arranging the redemption the personal representatives had to deal with the family corporation, in which they occupied positions of control as directors, officers and stockholders. All of this was known to the testator when the will was executed. Thus it is clear that the only conflicting fiduciary positions in which the personal representatives found themselves resulted from the wishes and intentions of the testator and not from any independent actions on their part. In such circumstances, based on the authorities cited, "there was an implied exemption from the duty of loyalty insofar as that transaction was concerned." Bogert, *Trusts and Trustees,* § 543U, p. 543 (rev. 2d. ed. 1978).

As there is no allegation or evidence of fraud or bad faith on the part of the personal representatives there remains the question of whether they abused their discretion in agreeing to the deferred payment terms of the stock redemption note. Our study of the voluminous record extract fails to disclose any evidence to support a finding of such abuse. The appellee concedes that "Max Rubin Industries . . . has had cash problems since 1969" and "for several years prior to the death of Max Rubin, there were severe losses and the clothing industry as a whole had been in difficulty since 1966." Evidence produced by the appellants fully supports their position that there was no market for the stock in question and that the family corporation's financial condition is such that it is unable to pay $203,000 in cash to the estate at the present

time. Testimony to this effect was virtually uncontradicted. Under these circumstances and given the fact, conceded by the appellee, that it was the testator's intention that the family business be maintained, we think the chancellor erred in not approving the stock redemption plan — a plan which in the exercise of the broad discretion given them in the will the personal representatives had full authority to adopt and implement. What was said by the Court of Appeals in *Offutt v. Offutt,* 204 Md. 101, 102 A.2d 554 (1953) applies here:

> "The principle that the exercise by a trustee of a personal discretion conferred upon him is not subject to control by the court, except to prevent an abuse of discretion, (Citations omitted) remains applicable even when the court has assumed jurisdiction. . . . Thus, where a personal power of discretion is vested in the trustees, the Chancellor, even after an assumption of jurisdiction, will require a showing of abuse of discretion before substituting his judgment for that of the trustees, even though he might control their imperative, impersonal, or ministerial powers."

## D

The final issue concerns the chancellor's rulings regarding counsel fees and commissions. The personal representatives had requested and received commissions totalling $7,199.05 in the four prior administration accounts without objection from the appellee. In their Fifth and Final Administration Account, additional commissions of $13,363.45 [4] and counsel fees of $27,200.00 were requested pursuant to petitions therefor filed in the Orphans' Court and incorporated in the bill of complaint. The counsel fees were for legal work performed for the estate by Messrs. Greenberg and Silber up to

---

4. Actually, only Messrs. Greenberg and Silber are to receive commissions as the other non-lawyer personal representatives have agreed not to share in the commissions.

the time of the present proceedings. Separate counsel represented the appellants in the proceedings before the chancellor and the bill of complaint prayed that the court award the separate counsel "a reasonable fee . . . from Decedent's Estate."

In his memorandum opinion, the chancellor found that the "fees and commissions claimed [by Messrs. Greenberg and Silber] are reasonable and would be otherwise allowable," but he subordinated their claim to the payment of the $45,110.10 cash he required the personal representatives to pay to the appellee, Edythe. In so doing the chancellor noted that, "It is regrettable that there is not enough money left in the estate [5] to make this payment [45,111.10] and also pay the commissions and counsel fees sought by Mr. Greenberg and Mr. Silber and, to that extent, they may suffer."

With respect to the personal representatives' separate counsel who represented them in the instant proceedings, the chancellor concluded that he "should certainly be compensated" but that because Edythe "had a justifiable complaint of wrongful action by the personal representatives it would be inequitable to charge the estate with the burden of counsel fees for the attorney that they were required to engage to defend them." Consequently, in the Order of February 1, 1980, appealed from, the chancellor ordered that the counsel's fees "are payable by the Personal Representatives and shall not be payable by the estate."

In view of our holding concerning the immediate payment to Edythe of the $45,110.10 from the estate and in view also of the statutory provisions for the payment of commissions and counsel fees from the estate,[6] we shall reverse the por-

---

5. Apparently, there was approximately $60,000 cash in the estate at the time of trial.

6. Section 7-603 of the Estates and Trusts Article provides:

"When a personal representative or person nominated as personal representative defends or prosecutes a proceeding in good faith and with just cause, he shall be entitled to receive his necessary expenses and disbursements from the estate regardless of the outcome of the proceedings. (An. Code 1957, Art. 93, § 7-603; 1974, ch. 11, § 2.)"

tions of the February 1, 1980 Order dealing with commissions and counsel fees and remand the matter for further proceedings in this regard. We think the personal representatives or the separate counsel should be given a reasonable time within which to file a petition setting forth "in reasonable detail" the work of separate counsel pursuant to Section 7-602 of the Estates and Trusts Article (Md. Ann. Code, 1974). After notice to all parties, and unless agreement is reached, a hearing can then be held to allow the court to determine under all the circumstances "what would be a fair and reasonable total charge [including commissions] for the cost of administering the estate and it shall not allow aggregate compensation in excess of that figure." Sec. 7-602, Estates and Trusts Article; *see, also, Wright v. Nuttle,* 267 Md. 698, 701, 298 A.2d (1973).[7]

> *Judgment affirmed in part and reversed in part; case remanded for further proceedings not inconsistent with this opinion; costs to be paid by the personal representatives from funds in the Estate of Max Rubin.*

7. Appellants' argument that appellee should be required to pay costs and attorneys' fees pursuant to Md. Rule 604b is without merit.