481 A.2d 919

**AMERICAN BOOKSELLERS ASSOCIATION, INC.,** Association of American Publishers, Council for Periodical Distributors Associations, Freedom To Read Foundation, National Association of College Stores, Inc., Robin's Book Store, Inc., Sandford Books, Inc., Valley Distributors, Inc., and Nina Landsberg, Appellants

v.

**Edward G. RENDELL,** District Attorney, Philadelphia County, Morton Solomon, Police Commissioner, City of Philadelphia, Joseph A. Smyth, Jr., District Attorney, Montgomery County, William J. Bambi, Chief Of Police, Borough of Norristown, and Clement Reedel, Chief Of Police, Upper Merion Township.

Superior Court of Pennsylvania.

Argued Sept. 7, 1983.

Filed Aug. 24, 1984.

Petition for Allowance of Appeal Denied Jan. 8, 1985.

538

540

546

Michael A. Bamberger, New York City, for appellants.

Sarah B. Vandenbraak, Assistant District Attorney, Philadelphia, for appellees.

Before ROWLEY, POPOVICH and MONTGOMERY, JJ.

ROWLEY, Judge:

This is an appeal from the Final Decree entered by the Honorable William J. Marutani, upholding Pennsylvania's obscenity statute against First Amendment attack. Following our review of the record, and consideration of the arguments presented within the briefs and at oral argument, we affirm.

On December 18, 1980, plaintiff-appellants,[1] representing publishers, wholesalers and retailers involved in the dissemination of printed materials, as well as the reading public, filed a Complaint in Equity seeking to have 18 Pa.Cons.Stat. § 5903(a)(1) declared unconstitutional. Section 5903(a)(1) prohibits the "display of any explicit sexual materials as defined in subsection (c) ..."[2] Appellants requested spe-

**1.** The American Booksellers Association, Inc.; the Association of American Publishers; the Council for Periodical Distributors Association; the Freedom to Read Foundation; the National Association of College Stores, Inc.; Robin's Bookstore, Inc.; Sandford Books, Inc., Valley Distributors, Inc., and Nina Landsberg were plaintiffs in this action.

**2.** § 5903. Obscene and other sexual materials.
 (a) Offenses defined.—No person, knowing the obscene character of the materials involved, shall:
 (1) display or cause or permit the display of any [obscene] *explicit sexual materials as defined in subsection (c)* in or on any window, showcase, newsstand, display rack, billboard, display board, viewing screen, motions picture screen, marquee or similar place in such manner that the display is visible from any public street, highway, sidewalk, transportation facility or other public thoroughfare, *or in any business or commercial establishment where minors, as a part of the general public or otherwise, are or will probably be exposed to view all or any part of such materials.*
As amended 1977, Nov. 5, P.L. 221, No. 68, § 1, effective in 60 days; 1980 Oct. 16, P.L. 978, No. 167, § 2, effective in 60 days.
Language added by the 1980 amendment has been underlined, and the deleted portions, bracketed.
 The definition of "explicit sexual materials," found in § 5903(c), which was not amended in 1980, reads as follows:
"Explicit sexual materials," as used in this subsection, means materials which are obscene or:
 (1) any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors; or

cial injunctive relief, to forestall enforcement of the statute prior to the preliminary hearing. Appellant's further sought a preliminary injunction, pending disposition of their request for a permanent remedy. Named as defendants were prosecutorial and law enforcement personnel within Philadelphia and Montgomery Counties.[3]

The Honorable Eugene Gelfand scheduled a hearing on appellants' request for a preliminary injunction. Judge Gelfand declined, however, to issue the special injunction sought by appellants. Nevertheless, two of the defendants-appellees agreed to forego institution of criminal proceedings under the amended statute until after the preliminary hearing.[4]

Following the preliminary hearing, held before the Honorable Stanley Greenberg, an Order was entered enjoining appellees Smyth, Bambi and Reedel, who had not appeared at the hearing, from enforcing or threatening to enforce the challenged provision against appellants or any member of

> (2) any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (1), or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors.
>
> The definition of "harmful to minors," which also remained intact during the 1980 amendment, is found in § 5903(e)(6):
>
> (6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it:
>
> (i) predominantly appeals to the prurient, shameful, or morbid interest of minors; and
>
> (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
>
> (iii) is utterly without redeeming social importance for minors.

3. Specifically named as defendants were Edward G. Rendell, District Attorney of Philadelphia County; Morton Solomon, Police Commissioner of the City of Philadelphia; Joseph A. Smyth, Montgomery County District Attorney; William J. Bambi, Chief of Police of Norristown Borough, and Clement Reedel, Chief of Police, Upper Merion Township.

4. The notes of testimony from the final hearing reveal that appellees Rendell and Solomon, through their attorney, participated in this agreement. (N.T. 83a–84a).

appellant associations.[5] Furthermore, a final hearing was scheduled for December 26, 1980.[6]

At no time prior to initiation of this action had any of the appellants been charged with violation of § 5903, or threatened with prosecution under the statute.[7] At the final hearing before Judge Marutani, however, the testimony of appellants' witnesses evidenced a perception on the part of booksellers and distributors that compliance with the statute necessitated the exclusion of all minors from store premises, or the display *solely* of materials suitable for children.

On December 11, 1981, Judge Marutani issued a written Adjudication with Decree Nisi finding § 5903(a)(1) constitutionally sound, and thus denying appellants' request for declaratory and permanent injunctive relief. The trial judge also dismissed the Complaint in Equity with prejudice.

Appellants' timely exceptions were dismissed on March 1, 1982, and the Decree Nisi was made final. Notice of Appeal to this court was filed on March 9, 1982.

■ On appeal from a final decree, the test is whether the trial court, in entering the decree, abused its discretion or committed an error of law. *Neshaminy Const. v. Philadelphia, Etc.*, 303 Pa.Super. 420, 449 A.2d 1389 (1982). Appellants raise before us the following questions:

1. Are the terms "harmful to minors," "display," "minor," and "as part of the general public or otherwise" so vague that reasonable persons are not given notice of prohibited conduct?

5. Appellees Rendell and Solomon agreed to continue their non-enforcement policy pending the final hearing. (N.T. 83a–84a.)

6. Prior to the final hearing, a Motion to Dismiss the Complaint was filed on behalf of Joseph Smyth, District Attorney of Montgomery County. On January 6, 1981, Judge Marutani granted this motion.

7. This action was filed in the trial court on December 18, 1980, three days after the effective date of the 1980 amendments.

2. Given its ambiguity, does § 5903(a)(1) impose an impermissible prior restraint on booksellers, by forcing them to choose between censoring publications prior to their display, or risking prosecution?

3. Does § 5903(a)(1), by reference to the statutory definition of "harmful to minors," unreasonably restrict adult access to non-obscene materials?

4. Does § 5903(a)(1) unreasonably restrict the access of minors to constitutionally protected materials, in that compliance with the statute may result in the exclusion of minors from bookstores, etc., thereby precluding their exposure to non-obscene (non-harmful) materials stocked therein?

5. Does the obscenity statute violate federal and state equal protection provisions by specifically exempting non-commercial establishments from its prohibitions?

6. Will the Rules of Statutory Construction permit the obscenity statute, as amended, to be construed as constitutional, given the equal protection violation?

Although responding to the substantive issues asserted here, appellees initially question appellants' standing to challenge the obscenity statute at this time. We address this latter contention first.

## I. Standing

Appellants are four trade association,[8] one non-profit organization, one wholesale and two retail book distribu-

---

8. The American Booksellers Association, Inc. is a trade association, comprised of individual bookstores, department store bookstores, and chain bookstores. Approximately 53 of its members are located in Philadelphia, and five are within Montgomery County.

The Association of American Publishers, Inc. is a national association of publishers of general, education, and religious books and materials sold throughout the United States. The association has four members in the City of Philadelphia, although all of its members publish materials sold within the Commonwealth.

The Council for Periodical Distributors Associations is also a national trade association, whose 500 members are local wholesale distributors of paperback books and newspapers. One member conducts business in Philadelphia, and another, in Montgomery County.

tors, and one individual. Collectively, appellants questioned the constitutional validity of the obscenity statute's display provision as applicable to them, although none of them had been prosecuted or threatened with prosecution. Furthermore, appellants alleged that enforcement, or the threat of enforcement, of the display provision will result in the constitutionally impermissible denial of protected materials to adults and minors in general. Given the unusual procedural posture of this case, and the significance of the First Amendment claims raised, we review, initially, general principles of standing.

■ Relying on United States Supreme Court procedents, the Pennsylvania Supreme Court, in *Wm. Penn Parking Garage, Inc., v. City of Pittsburgh,* 464 Pa. 168, 192, 346 A.2d 269, 280–281 (1975), summarized the concept of standing:

> [A] person who is not adversely affected in any way by the matter he seeks to challenge is not "aggrieved" thereby and has no standing to obtain a judicial resolution of his challenge. In particular, it is not sufficient for the person claiming to be "aggrieved" to assert the common interest of all citizens in procuring obedience to the law. (Citations omitted.)

In determining whether the interest asserted renders a litigant "aggrieved," the Court must ascertain whether the interest is "substantial," "direct," "immediate," and "not a remote consequence" of the challenged action. As Mr. Justice Roberts elaborated,

> [T]he requirement of a "substantial" interest simply means that the individual's interest must have substance—there must be some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law.

*Id.,* 464 Pa. at 195, 346 A.2d at 282.

The National Association of College Stores, Inc. is a trade association of college stores located throughout the United States, with approximately 133 members within Pennsylvania.

The additional requirement, that the interest be direct, simply means that the person claiming to be aggrieved must show causation of the harm to his interest by the matter of which he complains.

*Id.*

The remaining requirements, that the interest be "immediate," and "not a remote consequence" reflect a single concern.

Here the concern is with the nature of the causal connections between the action complained of and the injury to the person challenging it.

*Id.*, 464 Pa. at 197, 346 A.2d at 283.

■ Thus, to justify judicial intervention, a party must allege a recognizable, adverse effect to himself and a close causal nexus between the injury and the challenged conduct.[9]

■ As the representative of its members, an *association* may also have standing. An association must allege that its members, or any one of them, are suffering immediate or threatened injury, resulting from the challenged action, sufficient to satisfy the *Wm. Penn Parking Garage, Inc.* standard. If this can be demonstrated, and if the nature of the claim asserted and the relief sought does not render the individual participation of each injured party indispensable to proper resolution of the issue, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction. *See 1000 Grandview Ass'n v. Mt. Wash. Assoc.*, 290 Pa.Super. 365, 434 A.2d 796 (1981), quoting *Warth v. Seldin*, 422 U.S. 490, 511, 95

---

9. We recognize that the concept of standing has not been defined with complete consistency in the various cases decided by the United States Supreme Court. As Mr. Justice Rehnquist recently commented, "this very fact is probably proof that the concept cannot be reduced to a one-sentence or one-paragraph definition." *Valley Forge, Etc. v. Americans United, Etc.*, 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700, 711 (1982).

S.Ct. 2197, 2211, 45 L.Ed.2d 343, 362 (1975) (citations omitted.)[10]

In the First Amendment realm, traditional standing rules have been further modified. Thus, a litigant is permitted to question, on grounds of overbreadth, the constitutionality of legislation as applied to persons in situations not before the court. As noted in *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the doctrine of overbreadth accords standing by reason of the chilling effect that a particular law might have upon the exercise of first amendment rights.

> Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

*Id.,* at 612, 93 S.Ct. at 2916, 37 L.Ed.2d at 840.

*See also, Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), noted with approval in *Commonwealth v. DeFrancesco,* 481 Pa. 595, 393 A.2d 321 (1978). Nevertheless, this modification is limited. A litigant has no standing to assail legislation on the basis of overbreadth, where he does not claim specific, subjective harm, or the threat of specific future harm, or where the alleged overbreadth is not substantial, when judged in relation to the statute's plainly legitimate sweep. *Commonwealth v. DeFrancesco, supra.*

With these principles in mind, we conclude that appellant book distributors and trade associations have standing to litigate the questions here presented, and that appellants

---

**10.** While acknowledging other jurisdictions' holdings to the contrary, Judge Wickersham, writing for this Court in *1000 Grandview Ass'n, supra,* noted that the reasoning in those cases predated or ignored *Warth's* holding regarding representational standing. Recently, this concept of standing was implicitly approved by our Supreme Court, in *In Re Application of Family Style Restaurant, Inc.,* 503 Pa. 109, 468 A.2d 1088 (1983).

Nina Landsberg and the Freedom to Read Foundation do not.[11]

Appellant book distributors and trade associations have alleged specific, substantive harms to their members. These appellants have maintained that the continued viability of § 5903(a)(1) would compel their members to (1) withdraw questionable material from public view, (2) completely bar minors from their premises or (3) face arrest and prosecution under the allegedly unconstitutional statute. Thus, appellants have alleged that their members' First Amendment rights were threatened, if not already impaired, at the time relief was sought. Unquestionably, the loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547, 565 (1976). Furthermore, the financial harm asserted, no less than the significant constitutional deprivation averred, warrants characterization of the injury as "substantial." *See, Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975) (Where parking tax was imposed upon their patrons, parking lot operators, who alleged that they would suffer losses of net income due to reduced patronage of their facilities, had met "substantial interest" component of standing test).

In addition, we view the injury claimed here—the need to choose between self-censorship and criminal prosecution—as a "direct" consequence of the 1980 amendment to the obscenity statute. The commercial activity of booksellers unquestionably falls within the scope of the amended legislation, designed to restrict the method of presentation of "explicit sexual materials." Moreover, apprehension concerning the applicability of an allegedly vague and over-

11. The trial court did not differentiate between the parties, merely stating,

> There exists a genuine risk of prosecution: plaintiffs' activities are potentially within the scope of section 5903; the District Attorney has not agreed to permanently refrain from prosecuting thereunder; and plaintiff bookstore owners thus risk the alternative of injury or barring minors from its bookstores. (Tr.Ct.Op., at 7.)

broad penal statute may adversely impact on publishers and wholesale distributors as well, in that the variety of books and magazines ordered from them for retail display may become limited. We find, then, a causal connection between the injury alleged and the challenged statute.

The *nature* of the causal link here, however, initially appears too attenuated to confer standing on *any* of the parties.

Prior to commencement of this action, none of the appellants had been prosecuted, or threatened with prosecution, for violation of § 5903(a)(1). Pending disposition of this matter by the trial court, an agreement by the Philadelphia defendants and an order enjoining the remaining defendants precluded enforcement of the display provision against any of the plaintiffs. Yet, as the trial judge observed, no indication had been given that the Commonwealth would not thereafter seek to enforce the statute. Conversely, there had been no showing that appellants' apprehensions of criminal prosecution were more than speculations; appellants' own testimony merely evidenced their perceptions of the risks involved. Nonetheless, a causal connection fairly traceable to the amended provision can be discerned.

The language of the United States Supreme Court is instructive.

> A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms ... When the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases.

*Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120–1121, 14 L.Ed.2d 22, 28 (1965) (Citations omitted and emphasis added.)

In Dombrowski, arrests had been made pursuant to Louisiana subversive activity statutes. Subsequently the arrest warrants were quashed as not based on probable cause, and the defendants, officers of the Southern Conference Educational Fund, Inc., were discharged. Although criminal proceedings had not been re-instituted at the time these citizens brought an action seeking declaratory and injunctive relief, Louisiana officials had continued to threaten them with prosecution.[12] On appeal from the dismissal of the complaint, Mr. Justice Brennan remarked,

> Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their tights ... If the rule were otherwise, the contours of regulation would have to be hammered out case by case—and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation ... By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation. *Moreover, we have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of prosecution, unaffected by the prospect of its success or failure ...*

*Id.,* 380 U.S. at 487, 85 S.Ct. at 1121, 14 L.Ed.2d at 28–29. (Citations omitted and emphasis added.)

■■■ Here, appellants have maintained that the obscenity statute is overly broad, in that the display provision will unconstitutionally restrict adults' and minors' access to legitimate literary works. Appellants have also vocalized

12. On defendants' application, the trial judge issued a temporary restraining order pending hearing and decision on defendants' complaint. Following a hearing, the temporary restraining order was dissolved and the complaint dismissed. Thereafter the grand jury returned indictments under the Subversive Activities and Communism Control Act against the individual defendants.

concern over the chilling effect that the continued existence of the display provision, within the context of a penal statute, will engender. In light of *Dombrowski,* then, we conclude, as did the trial court, that appellants need not await criminal prosecution before contesting the validity of these statutory amendments.

We recognize that in *Dombrowski* the appellants had previously been charged with violation of the very statute challenged, and that threats of prosecution were outstanding at the time the complaint was filed. Given the magnitude of the constitutional right involved, however, we do not view these facts as controlling.

In 1968 the Supreme Court reviewed an Arkansas statute which prohibited teachers in state-supported schools and universities from teaching the Darwinian theory of evolution. Violation was made a misdemeanor, and subjected the violator to dismissal from his position. At the beginning of the 1965–66 academic year, Susan Epperson, a teacher in the Little Rock school system, was confronted with a new textbook, adopted by the school administration, which included a chapter on the Darwinian theory. Thus,

> [S]he faced at least a literal dilemma because she was supposed to use the new textbook for classroom instruction and presumably to teach the statutorily condemned chapter, but to do so would be a criminal offense and subject her to dismissal.

*Epperson v. Arkansas,* 393 U.S. 97, 100, 89 S.Ct. 266, 268, 21 L.Ed.2d 228, 232 (1968).

Ms. Epperson instituted an action in equity, seeking a declaration that the Arkansas statute was unconstitutionally vague and violative of the First Amendment's free exercise and establishment clauses. She also sought to enjoin school officials from dismissing her for violation of the statute's provisions.

Ms. Epperson had not been criminally charged under the statute, nor subjected to dismissal. Moreover, Mr. Justice Fortas observed that no prosecutions had been brought under the Arkansas statute during its 40–year history,

characterizing the statute as "more of a curiosity than a vital fact of life" in Arkansas. *Id.*, at 102, 89 S.Ct. at 269, 21 L.Ed.2d at 233. Finally, Mr. Justice Black, in his concurring opinion in *Epperson*, expressed concern regarding Ms. Epperson's standing to raise this issue. *Id.*, at 109–110, 89 S.Ct. at 273, 21 L.Ed.2d at 237 (Black, J., concurring.) Notwithstanding the aforementioned considerations, the majority addressed the merits.

If the factual allegations in *Epperson* were sufficient to warrant judicial review, the averments in the instant case also demonstrate a close, causal relationship between the alleged harm and the challenged legislation. The prohibition against the display of obscene materials found in the Pennsylvania obscenity statute was added during the general revision of the statute of 1977. In 1980 the display provision was amended. The amendatory language had been in effect merely three days prior to initiation of the present action. Moreover, since 1977 prosecutors throughout the Commonwealth have persisted in prosecuting, although not always successfully, booksellers and distributors for violation of the obscenity law.[13] Although for three years prior to initiation of this action, the original display provision existed without undergoing appellate review, the Commonwealth's vigilance in enforcing the obscenity statute in general, suggests that appellants' fears of criminal prosecution are not unreasonable.

Yet, the existence of criminal sanctions has not always sufficed to confer standing, even in the First Amendment context. In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), four individuals challenged, on First Amendment grounds, California's criminal syndicalism statute. One individual, Harris, had been prosecuted for violation of the statute. None of the remaining three, however,

**13.** *See*, for example, *Lamb v. Broadway-Points, Inc.*, 11 D. & C.3d 84 (1978): *Commonwealth v. Good Times Sales Co.*, 55 Pa.Commw. 160, 423 A.2d 451 (1980); *Brightbill v. Rigo, Inc.*, 274 Pa.Super. 315, 418 A.2d 424 (1980); *Long v. 130 Market Street Gift & Novelty of Johnstown*, 294 Pa.Super. 383, 440 A.2d 517 (1982), and *Commonwealth v. Doe*, 316 Pa.Super. 1, 462 A.2d 762 (1983).

had even been threatened with prosecution. Rather, they claimed that, because of the existence of the statute, and the prosecution against Harris, they felt inhibited in advocating the program of their political party through peaceful, non-violent means, or in teaching Marxist doctrines. The Supreme Court held that the latter three did not have standing.

> If these three had alleged that they would be prosecuted for the conduct they planned to engage in, and if the District Court had found this allegation to be true—either on the admission of the State's district attorney or on any other evidence—then a genuine controversy might be said to exist. But here appellees ... do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible. They claim the right to bring this suit solely because, in the language of their complaint, they "feel inhibited."

*Id.*, at 42, 91 S.Ct. at 749, 27 L.Ed.2d at 674.

The present case is distinguishable from *Younger*. Here, appellants *have* alleged that, should their members not engage in self-censorship, they could be prosecuted under the amended display provision; the trial court also concluded that a genuine risk of prosecution existed.[14] Moreover, appellants have claimed that they would suffer a pecuniary loss in attempting to comply with the statute as currently written. More than mere feelings of inhibition, then, are involved here.

The Court's resolution of the standing question in *Linda R.S. v. D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) is similarly distinguishable. The appellant there, the mother of an illegitimate child, brought an action to enjoin the "discriminatory application" of a Texas criminal statute governing the failure to provide child support. By state

---

14. For purposes of clarification, we note that Judge Marutani reached this conclusion when confronted with the question of standing. However, in resolving the merits of the case, the trial judge refused to accept the appellants' dire predictions of censorship.

judicial construction, the provision was made applicable only to married parents. Appellant sought to enjoin the local district attorney from refraining from prosecuting the father of her child. On appeal, the Supreme Court affirmed the dismissal of the case for want of standing, finding that the causation requirement had not been met.

[A]ppellant has made no showing that her failure to secure support payments results from the nonenforcement, as to her child's father, of (the relevant penal provision.) ... [T]he statute creates a completed offense with a fixed penalty as soon as a parent fails to support his child. Thus, if appellant were granted the requested relief, it would result only in the jailing of the child's father. The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative.

*Id.*, at 618, 93 S.Ct. at 1149, 35 L.Ed.2d at 541.

Finally, the Court noted that in American jurisprudence, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another. *Id.*, at 619, 93 S.Ct. at 1149, 35 L.Ed.2d at 541–42.

Referring to the *Linda R.S. v. D.*, decision, Justice Roberts of the Pennsylvania Supreme Court remarked,

Because any action under the criminal statute would be dependent on the discretion of the prosecutor, there was no basis in the record for the conclusion that a decision holding the classification invalid would assist the plaintiff in obtaining support payments.

*Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 197, 346 A.2d 269, 283 (1975).

■ However, here appellant book distributors and trade associations have asserted more than an interest in the prosecution of others—they have expressed concern over the risk of prosecution that they themselves run. Furthermore, the remedy sought here—invalidation of the amended display provision—*will* remove the threat of harm alleged. Finally, while appellees' prosecution of appellants under the challenged provision is indeed discretionary, this factor does

not mitigate against any chilling effect that potential prosecution under the existing statute may evoke, for appellants' business activities may well be within the "zone of interests sought to be ... regualted by the statute ... in question." *Id*, 464 Pa. at 198 n. 23, 346 A.2d at 284 n. 23.

In summary, the fact that the amended display provision has not been applied to the bookstore owners or trade association members involved here does not defeat the existence of a controversy. An anticipatory attack is appropriate where the allegedly unconstitutional statute would interfere with the way the parties normally conduct their affairs, thereby rendering them "aggrieved." These appellants have alleged as much here. Accordingly, we find that they have standing.

Furthermore, the individual participation of each allegedly injured trade association member is not indispensable to proper resolution of the issues raised before us. Thus, the trade associations involved herein have been, and continue to be, appropriate representatives of their members, entitled to invoke our jurisdiction. *See, 1000 Grandview Ass'n v. Mt. Wash. Assoc.*, 290 Pa.Super. 365, 434 A.2d 796 (1981).

Finally, we observe that appellants have alleged that the continued existence of the amended display provision will result in the unconstitutional denial of protected materials to adults and minors. The spectrum of material available for purchase by adults, it is alleged, will be narrowed to only that suitable for children. In addition, appellants claimed that, given the prohibition against the display of "explicit sexual materials," minors will be completely denied access to these retail establishments, or will be forced to select only from those works undoubtedly outside the scope of § 5903(a)(1). Moreover, appellants allege that § 5903(a)(1) is also overbroad in that it is not limited to the purveyors of books.[15] Because we deem the

15. The obscenity statute provides,
 *No person,* knowing the obscene character of the materials involved, shall ... (Emphasis added.)

overbreadth alleged herein substantial, in comparison with the statute's clearly legitimate sweep, appellants also have standing to assert the rights of these third parties.

Appellants Nina Landsberg and the Freedom to Read Foundation, however, do not have standing in the instant case.

 Nina Landsberg, an adult, Philadelphia resident, reads books, magazines, and newspapers. Presumably, the same could be said of many adult residents of Philadelphia. Yet Ms. Landsberg has not alleged that she is potentially subject to prosecution under § 5903(a)(1), or that she may face financial loss as a result of the 1980 amendments; she has merely implied that her choice of reading materials may become limited. Asserting, then, a claim applicable to many adult members of the Philadelphia community, Ms. Landsberg has failed to allege more than the abstract interest of all citizens in the legislature's compliance with constitutional mandates.

 The Freedom to Read Foundation, a non-profit organization, was established in 1969 by the American Library Association. The Foundation has enunciated here four objectives: (1) the establishment of libraries; (2) the support of the right of libraries to include in their collections and make available any work which they may legally acquire; (3) the promotion and defense of First Amendment rights, and (4) the setting of legal precedent for the freedom to read on behalf of all citizens. Significantly, libraries are specifically *exempted* from the scope of the obscenity statute. We therefore have difficulty discerning any *adverse* impact on the Foundation's efforts. In addition, the desire to "set legal precedent" and "promote and defend first amendment rights" does not, in itself, suffice to confer standing on a party, under any articulation of the principle of standing, or its modifications.

Nonetheless, because appellant trade associations and book distributors have standing to pursue the questions raised here, we turn to the merits of this appeal.

## II. CONSTITUTIONALITY OF THE STATUTE

### a. General overview

 It is beyond cavil that obscene material is not within the protective scope of the First Amendment to the federal constitution. *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419, reh. denied, 414 U.S. 881, 94 S.Ct. 26, 38 L.Ed.2d 128 (1973). Moreover, there is no fundamental right to protection from prosecution for publication of materials abusive of First Amendment rights, such as obscenity, in this Commonwealth. Pa. Const. Art. 1, § 7. *Commonwealth v. Doe*, 316 Pa.Super. 1, 462 A.2d 762 (1983); *Long v. 130 Market St. Gift & Novelty of Johnstown*, 294 Pa.Super. 383, 440 A.2d 517 (1982).

Over time, the concept of obscenity has undergone substantial revision and refinement. *See, e.g., Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966); *Miller v. California, supra*. As applied to minors, the United States Supreme Court has approved the adoption of an obscenity standard that is broader than the standard appropriate for adults:

> Because of the State's exigent interest in preventing distribution to children of objectionable material, it can exercise its power to protect the health, safety, welfare and morals of its community by barring the distribution to children of books recognized to be suitable for adults.

*Ginsberg v. New York*, 390 U.S. 629, 636, 88 S.Ct. 1274, 1278–1279, 20 L.Ed.2d 195, 202 reh. denied, 391 U.S. 971, 88 S.Ct. 2029, 20 L.Ed.2d 887 (1968), quoting *Bookcase, Inc. v. Broderick*, 18 N.Y.2d 71, 75, 271 N.Y.S.2d 947, 952, 218 N.E.2d 668, 671 (1966).

[23] Pennsylvania courts have similarly recognized the state's significant interest in the protection of its youth.

Concurring in the decision in *Commonwealth v. Robin*,[16] Mr. Justice Roberts observed,

> Carefully drawn restrictions on the sale or distribution of [materials not obscene for adults] to juveniles would in no way embody a novel approach. Courts have traditionally sanctioned policies which seek to accord special protection and treatment to our youth in such areas as the sale of intoxicating beverages, cigarettes and firearms; the operation and ownership of motor vehicles; the trial of juvenile offenders; and in many matters relating to their health, welfare, education and employment.

*Commonwealth v. Robin*, 421 Pa. 70, 73, 218 A.2d 546, 547 (1966) (Roberts, J., concurring.) *See also Commonwealth v. Baer*, 209 Pa.Super. 349, 227 A.2d 915 (1967), aff'd 436 Pa. 18, 257 A.2d 254 (1969).

The specific penal provision challenged here reflects this concern:

> § 5903. Obscene and other sexual materials
>
> (a) Offenses defined.—No persone, knowing the obscene character of the materials involved, shall:
>
> (1) display or cause or permit the display of any *explicit sexual materials as defined in subsection (c)* in or on any window, showcase, newsstand, display rack, billboard, display board, viewing screen, motions picture screen, marquee or similar place in such manner that the display is visible from any public street, highway, sidewalk, transportation facility or other public thoroughfare, or in any business or commercial establishment *where minors, as a part of the general public or otherwise, are or will probably be exposed to view all or any part of such materials;*

(Emphasis added.)

Dealing with the limited subject of the *display* of explicit sexual materials, § 5903(a)(1) is not a general obscenity

**16.** In *Robin,* the Court, in conformity with the United States Supreme Court's determination that the work was not obscene, reversed the trial court's order enjoining circulation of the book "Tropic of Cancer."

provision. The statutorily-defined category "explicit sexual materials" is broader than the category "obscene materials." (Compare §§ 5903(b), (c) and (e)(6).) Clearly, then, this broader classification was intended to provide *additional* protection from exposure to erotic materials to the youth of this Commonwealth.

 Nevertheless, "minors are entitled to a significant measure of First Amendment protection ... and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–213, 95 S.Ct. 2268, 2274, 45 L.Ed.2d 125, 133 (1975). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.,* at 213–214, 95 S.Ct. at 2275, 45 L.Ed.2d at 133. Thus, legislatures may not trample upon the First Amendment rights of adults *or* minors in their efforts to protect the younger members of the community. In reviewing a challenge to any such statute, this, then, must be the paramount consideration.

### b. Vagueness

 Characterizing § 5903(a)(1) as unconstitutionally vague, appellants contend that the amended obscenity statute is violative of their members' due process rights in that it does not provide adequate notice of proscribed conduct. Although Judge Marutani, emphasizing the scienter requirement, concluded that § 5903(a)(1) was not void for vagueness, appellants question here the precision of the phrases "harmful to minors," "minor," "display," and "as a part of the general public of otherwise." [17] While it is true

17. Appellees maintain that appellants have waived any vagueness challenges to the terms "minor" and "display" as they appear in the amended obscenity statute. At trial, however, appellants raised the issue of the statutory meaning of "minors," and appellees responded. (Repro.Rec. pp. 111a, 134a–137a.) Moreover, this contention was reasserted in appellants' Exceptions to Decree Nisi and the brief filed in support thereof. The vagueness attack on the specific word "dis-

that statutory vagueness will not be excused by the salutary purpose of protecting minors, *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968), we nonetheless disagree with appellants' assessment of this statutory scheme.

Legislation aimed at shielding children from allegedly harmful expression must be clearly drawn; the standards adopted must be *reasonably* precise to ensure that those governed by the law and those administering it can understand its meaning and application. *Interstate Circuit, Inc., supra; Cf. Duggan v. 807 Liberty Ave., Inc.*, 447 Pa. 281, 288 A.2d 750 (1972). Judicial vigilance is commanded because of the danger of undue prior restraint and the possible chilling effect that regulation can inflict on the exercise of First Amendment freedoms. *Duggan, supra.* Yet statutes challenged on the ground of vagueness are not to be tested against paradigms of legislative draftsmanship.

> The fact that [the legislature] might without difficulty have chosen "clear and precise language" equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague.

*United States v. Powell*, 423 U.S. 87, 94, 96 S.Ct. 316, 320, 46 L.Ed.2d 228, 235 (1975), quoted with approval in *Commonwealth v. Heinbaugh*, 467 Pa. 1, 6, 354 A.2d 244, 246 (1976).

The root of the vagueness doctrine, then, is a "rough idea of fairness." *Commonwealth v. DeFrancesco*, 481 Pa. 595, 608, 393 A.2d 321, 327 (1978) (Citations omitted.) Finally, we note the strong presumption of constitutionality and the heavy burden of persuasion upon one who challenges the constitutionality of an Act of the General Assembly. *Commonwealth v. Doe*, 316 Pa.Super. 1, 10, 462 A.2d 762, 767

play" was also set forth in the brief filed in support of appellants' exceptions; thus the trial court was presented with an opportunity to address this issue. *See Cherry v. Willer,* 317 Pa.Super. 58, 63 n. 3, 463 A.2d 1082, 1084 n. 3. (1983).

(1983). Accordingly, legislation will not be declared unconstitutional unless it "clearly, palpably and plainly" violates the constitution; a mere showing of difficulty in determining whether conduct is within the definition will not suffice to meet this heavy burden. *Commonwealth v. Mikulan*, 504 Pa. 244, 470 A.2d 1339 (1983) (Zappala, J., concurring); *Snider v. Thornburgh*, 496 Pa. 159, 166, 436 A.2d 593, 596 (1981).

With these principles in mind, we review the specific phrases assailed as unconstitutionally vague.

Section 5903(a)(1) prohibits the display of explicit sexual materials. As indicated in subsection (c) "explicit sexual materials" entail erotic representations which are "harmful to minors." Section 5903(e)(6) defines "harmful to minors" as

> that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it:
>
> > (i) predominantly appeals to the prurient, shameful, or morbid interest of minors; and
> >
> > (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
> >
> > (iii) is utterly without redeeming social importance for minors.

This type of differentiation, which focuses upon a particularized audience, has been labeled "variable obscenity."

Appellants maintain that the impermissible vagueness of the phrase "harmful to minors" lies in the difficulty that merchants will face in deciding which materials are thereby prohibited from display to minors. Here appellants distinguish between the difficulty in ascertaining whether printed materials are "harmful to minors" and the difficulty in determining whether, under the prevailing standard,[18] they

---

18. In *Commonwealth v. Robin, supra,* our Supreme Court reaffirmed its position that, in determining the constitutionality of state obscenity statutes, the decisions of the federal courts are conclusive. *Id.,* 421 Pa. at 72, 218 A.2d at 546. The prevailing standard used in analyzing

are obscene for adults. The test for obscenity, appellants observe, includes a requirement that the material lack serious literary, artistic, political or scientific value. Works deemed "harmful to minors" may, however, possess serious literary, artistic, political or scientific merit for adults, but still subject a retailer to criminal liability for displaying them. This task is made even more difficult, appellants urge, by the statute's failure to take into account the varying maturity and intelligence levels of minors.

We note, initially, that appellants' argument evidences a dispute with the basic concept of "variable obscenity." Yet, as mentioned above, the United States Supreme Court has explicitly approved this type of differentiation in situations where the prospective audience is children. *Ginsberg v. New York,* 390 U.S. 629, 636, 88 S.Ct. 1274, 1278–1279, 20 L.Ed.2d 195, 201–202 (1968). Moreover, the Pennsylvania legislature and judiciary have long recognized a distinction between children and adults in the obscenity context. Given Pennsylvania's legitimate interest in this type of regulation, wholesale rejection of the doctrine of "variable obscenity" at this time is unwarranted.

Appellants also contest the language the Pennsylvania legislature used in implementing this concept. Specifically, appellants question the third prong of the "harmful to minors" test which requires that the description or representation be "utterly without redeeming social importance for minors."

We are guided here by the approach utilized by the Supreme Court in *Ginsberg v. New York, supra.* In *Ginsberg,* the Court analyzed a New York statute prohibiting the sale to minors of material defined as obscene on the basis of its appeal to them, whether or not it would be obscene for adults. The definition of "harmful to minors" in the New York statute parallels § 5903(e)(6). Although challenged as, *inter alia,* void for vagueness, the Supreme Court upheld the New York provision. As Mr. Justice

materials allegedly obscene for adults, then, is found in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

Brennan observed, the New York Court of Appeals had construed the statute as "virtually identical to the Supreme Courts' most recent statement of the elements of obscenity ...," set forth in *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). *Ginsberg,* 390 U.S. at 643, 88 S.Ct. at 1282, 20 L.Ed.2d at 206. Thus, the New York statute did not offend the requirements of due process.

 In analyzing appellants' vagueness claim, then, comparison of the disputed language with the Supreme Court's most recent articulation of the test for obscenity may be instructive. In *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419, reh. denied 414 U.S. 881, 94 S.Ct. 26, 38 L.Ed.2d 128 (1973), the Court altered the obscenity test developed in *Memoirs,* shifting from a standard requiring that material be "utterly without redeeming social value," to a test mandating that the work "lack serious literary, artistic, political, or scientific value." Subsequently, our Supreme Court was provided with the opportunity to interpret the Commonwealth's obscenity standard in light of *Miller. See Commonwealth v. MacDonald,* 464 Pa. 435, 347 A.2d 290 (1975), cert. denied 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).[19] As Justice Roberts opined,

[I]t is clear that if material is "utterly without redeeming social value" it must certainly lack "serious literary, artistic, political, or scientific value" so that requirement ... of the *Miller* standard is met.

*Id.,* 464 Pa. at 444–445, 347 A.2d at 295.

Because, as in *Ginsberg,* this state's highest court has construed the challenged language as in compliance with the prevailing standard of obscenity for adults, we find no impermissible vagueness in the statute's use of the language "utterly without redeeming social importance."

**19.** In *Commonwealth v. MacDonald, supra,* the Court found the then-existing obscenity statute deficient under *Miller,* because of its failure to specifically define that conduct whose depiction or description was forbidden.

Moreover, our analysis of the majority opinion in *Miller* convinces us that the term "utterly" was excised from the "social value" component of the obscenity test for reasons other than its putative vagueness. Mr. Chief Justice Burger expressed concern over the impossible burden placed upon the *prosecution* under the former test.

> [T]he *Memoirs* plurality required that to prove obscenity it must be affirmatively established that the material is "utterly without redeeming social value." Thus, even as they repeated the words of *Roth*, the *Memoirs* plurality produced a drastically altered test that called on the prosecution to prove a negative, i.e., that the material was "utterly without redeeming social value"—a burden virtually impossible to discharge under our criminal standards of proof."

*Id.*, 413 U.S. at 21–22, 93 S.Ct. at 2613, 37 L.Ed.2d at 429. *See also Hamling v. United States,* 418 U.S. 87, 116, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590, 619–620, reh. denied 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974) (*Miller's* rejection of "social value" formulation of *Memoirs* was not predicated upon unconstitutional vagueness, but rather stemmed from *Memoirs'* departure from the definition of obscenity in *Roth,* and from the resulting prosecutorial burden, "virtually impossible to discharge" and not constitutionally required.) Finally, Mr. Chief Justice Burger noted that, as a constitutional standard, the concept of "utterly without redeeming value" had never commanded the adherence of more than three Justices at one time. *Id.*, 413 U.S. at 23–24, 93 S.Ct. at 2614–2615, 37 L.Ed.2d at 430–431.

■ Undeniably, *Miller* relaxed the *Memoirs* test. The statutory provision questioned here, however, retained the earlier formulation. Considering that the legislature could have substituted a standard giving prosecutors greater leeway, but chose not to, appellants are advantaged by retention of the *Memoirs* language. Thus, we are not persuaded by appellants' suggestion that retention of the word "utterly" in § 5903(e)(6)(iii) renders the Pennsylvania obscenity statute unconstitutionally vague.

Appellants also contend that the statutes' failure to define what material will be utterly without redeeming social value *for minors* renders it fatally flawed. We disagree. Section 5903(e)(1) states that " 'minor' means any person under the age of 17 years." Consequently, to be "harmful to minors" printed materials must, *inter alia*, be utterly without redeeming social value for persons under the age of 17. Relying, however, on the prefatory language of section (e), "As used in subsection (c) and (d) of this section ...," appellants challenge the applicability of the statutory definition to the display provision. This language, appellants aver, suggests that the legislature did not intend that the display provision, subsection (a)(1), be governed by the definitional section. Thus, appellants conclude, in accordance with the Rules of Statutory Construction, the term "minor" within § 5903(a)(1) must be interpreted as including those individuals under the age of 21 years. 1 Pa.Cons. Stat. § 1991. Appellants also recognize that subsection (a)(1) deals with the display of "explicit sexual materials *as defined in subsection (c)* ..." and that the definitional section explicitly refers to subsection (c). Because of this cross-reference, then, the statutory definitions could be viewed as applicable to the display provision. Yet, it is the existence of these two possible interpretations, appellants contend, that results in the amended statute's unconstitutional vagueness.

 We have a duty to ensure that legislative intent is not thwarted by a construction which is unreasonably rigid and inflexible. *Commonwealth v. Duncan,* 456 Pa. 495, 321 A.2d 917 (1974). Construction of a statutory provision in connection with another section may aid this Court in ascertaining a section's real meaning and the legislative intent even if neither section refers to the other. Thereby, we can get an exact conception of the statute's aim and scope. *Turner v. May Corp.,* 285 Pa.Super. 241, 427 A.2d 203 (1981). In asserting that the legislature did not clearly indicate its intent when drafting § 5903(a)(1), appellants have not adhered to these basic precepts.

A general survey of the statutory scheme reveals that a reasonable person, using common sense, can determine the maximum age of persons comprising the class of "minors" for purposes of § 5903(a)(1). Section 5903(a)(1) is designed to restrict the display to *minors of explicit sexual materials.* On the other hand, § 5903(a)(2) prohibits the knowing sale, loan, etc., of *obscene materials to persons 17 years of age or older.* To define "minors," within the context of the display provision, as persons under the age of 21 would subvert the legislative intent, in that persons between the ages of 17 and 21 could thereby purchase materials which could not lawfully be displayed to them. For example, an 18-year-old could, conceivably, buy a magazine which, though not obscene for adults, could be classified as explicit sexual materials.

 Penal statutes are to be strictly construed. 1 Pa.Cons.Stat. § 1928(b)(1). However, strict construction does not require "that the words of a criminal statute [be] given their narrowest meaning or that the lawmakers' evident intent [be] disregarded." *Commonwealth v. Duncan,* 456 Pa. at 497, 321 A.2d at 919. (Citation omitted.) We presume that the legislature did not intend a result that is absurd or unreasonable. 1 Pa.Cons.Stat. § 1922. Here, discernible distinctions have been drawn between materials obscene for adults and those obscene for minors, and between persons 17 years of age or older, and minors. The display provision, then, does not fall for want of specificity in this regard.

 Appellants' final assault on the phrase "harmful to minors" focuses on the amended statute's failure to address the differing intelligence and maturity levels of minors. Yet the legislature has consistently viewed minors as a generic class [20] as has the judiciary.[21] More importantly,

---

20. *See,* e.g., the Support Law, 62 P.S. § 1974(a) ("unemancipated minor children"); the Pennsylvania Worker's Compensation Act, 77 P.S. § 561(5) ("minor child"), and the Criminal Spousal Testimony section of the Judicial Code, 42 Pa.Cons.Stat. § 5913 ("minor children.")

21. For example, in *Pincus Estate,* 378 Pa. 102, 105 A.2d 82 (1954), our Supreme Court reiterated that "a person is not sui juris at any age less

any criteria utilized must be objective. A subjective standard, such as intellectual development, would render the statute unenforceable; at the very least enforceability would be so difficult as to unduly burden the courts with time-consuming proofs. Thus, a complete enumeration of degrees of harmfulness, calibrated to correspond to varying levels of intellectual and emotional growth, would frustrate the legislative objective.

 Appellants also challenge the word "display." Arguing that the mere shelving of a book or magazine with sexually graphic photographs could lead to criminal prosecution, appellants maintain that the statute is unclear in terms of delineating what would constitute a prohibited "display." We cannot agree. The words of the English language are not unclear and ambiguous simply because the legislature has not often used them.[22] Rather, in such circumstances, the term must first be examined in light of its common and approved usage. *Wajert v. State Ethics Commission*, 491 Pa. 255, 420 A.2d 439 (1980): 1 Pa.Cons. Stat. § 1903. BLACK'S LAW DICTIONARY (5th Ed. 1979) defines a "display" as "an opening or unfolding, exhibition, manifestation, ostentatious show, exhibition for effect, parade." Similarly, WEBSTER'S NEW COLLEGIATE DICTIONARY (1976) states that "to display" is to "put or spread before the view publicly," "make evident," "exhibit ostentatiously," or "show off."[23] These definitions suggest

than [the relevant age of majority] *regardless of his physique, mentality, education, experience or accomplishments. Id.,* 378 Pa. at 109–110, 105 A.2d at 86. (*Emphasis added.*)

**22.** Appellants attack the obscenity statute as *amended in 1980,* conceding at trial that the previous statute was constitutional. Yet the earlier provision *did* include a display provision, albeit with a more restricted scope.

**23.** Pennsylvania courts have repeatedly used this definitional technique when construing words commonly used. *See, Wajert v. State Ethics Commission,* 491 Pa. 255, 420 A.2d 439 (1980) ("establishment"); *Commonwealth v. Duncan,* 456 Pa. 495, 321 A.2d 917 (1974)

that the mere shelving or stocking of questionable material, without in some manner directing attention to them, is not the type of conduct prohibited by virtue of the legislature's use of the term "display." Although specific contexts may add a particularized gloss to commonly-used phrases, which should be recognized when interpreting statutes, nothing on the face of this statute indicates that the legislature intended to deviate from this commonly-accepted meaning.

Other jurisdictions have acknowledged the constitutional validity of display provisions in this context. For example, a Tennessee ordinance prohibiting the display of explicitly sexual materials at newsstands or other places of business patronized by minors or to which minors are invited as customers was deemed constitutionally sound. *Capitol News Company v. Metropolitan Government of Nashville and Davidson County*, 562 S.W.2d 430 (Tenn.1978). As the Court noted, the

> display of nudity is only prohibited when it occurs in a manner designed to provoke or arouse lust or passion or to exploit sex, lust or perversion for commercial gain. We find entirely unpersuasive the contentions of appellant that incidental displays of nude or partially nude figures in magazines of general circulation ... violate this ordinance.

*Id.*, at 433.

*See also Dover News, Inc. v. City of Dover,* 117 N.H. 1066, 381 A.2d 752 (1977) (Although contested display ordinance held invalid, court recognized that a properly drawn ordinance, limited in scope to those materials described as harmful to minors under state law as set forth by the legislature would not be legally repugnant.)

Appellants have ignored the obscenity statute's scienter requirement. As § 5903(a) provides, "No person, *knowing* the obscene character of the materials involved, shall ..." (Emphasis added). "Knowing" is defined in § 5903(b):

("around"); *Commonwealth v. Darush,* 256 Pa.Super. 344, 389 A.2d 1156 (1978) ("retail dealer").

"Knowing." As used in subsection (a), knowing means having general knowledge of, or reason to know or a belief or ground for belief which warrants further inspection or inquiry of, the character and content of any material described therein which is reasonably susceptible of examination by the defendant.

■ Scienter or knowledge is constitutionally required to support an obscenity conviction. *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590, reh. denied 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974). This requirement rests on the need "to avoid the hazard of self-censorship and to compensate for the ambiguities inherent in the definition of obscenity." *Mishkin v. New York*, 383 U.S. 502, 511, 86 S.Ct. 958, 965, 16 L.Ed.2d 56, 63, reh. denied 384 U.S. 934, 86 S.Ct. 1440, 16 L.Ed.2d 535 (1966). As the Supreme Judicial Court of Massachusetts declared,

[A]bsent the scienter requirement, booksellers, unable to familiarize themselves with all the material on their shelves, would tend to restrict sales ... to the relatively few books of which they had some knowledge of the contents or character. The result would be an impediment to the sale ... not only of unprotected matter but also of that which is constitutionally protected.

*Commonwealth v. Corey*, 351 Mass. 331, 334, 221 N.E.2d 222, 224 (1966), quoted in *Commonwealth v. Rosenberg*, 379 Mass. 334, 398 N.E.2d 451 (1979).

Implicitly approving this reasoning, this Court recently held that only where the evidence demonstrates an accused's awareness of the character of the material alleged to be obscene may a conviction be sustained. *Commonwealth v. Doe*, 316 Pa.Super. 1, 462 A.2d 762 (1983). Knowledge of legal obscenity has not, however, been required. *See, e.g., Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195, reh. denied 391 U.S. 971, 88 S.Ct. 2029, 20 L.Ed.2d 887 (1968); *Commonwealth v. Trainor*, 374 Mass. 796, 374 N.E.2d 1216 (1978).

■ Unquestionably, the same concerns exist regarding the display of explicit sexual materials. Thus, only those defendants who knew, or reasonably should have known, of the graphic sexual representations or descriptions within them, may be subjected to prosecution for display of these materials. Therefore, appellants' vagueness attack on the phrases "harmful to minors" and "display" must fail.

■ Section 5903(a)(1) prohibits the display of explicit sexual materials in, *inter alia,* "any business or commercial establishment where minors, *as a part of the general public or otherwise,* are or will probably be exposed to view ... such materials." Appellants' remaining claim, that the underlined language is ambiguous, is erroneous. A common-sense reading of this phrase indicates that only those establishments open to the general public, or open exclusively to minors, fall within the statute's purview. The only business establishments excluded are those catering solely to adults, and, presumably, minors will not view the materials displayed therein.

There may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls. The existence of such cases, is not however, sufficient reason to hold the language too ambiguous to define a criminal offense. *Roth v. United States,* 354 U.S. 476, 491–492, 77 S.Ct. 1304, 1313, 1 L.Ed.2d 1498, 1510–1511 (1957). Accordingly, we find that § 5903(a)(1) withstands appellants' vagueness attack.

### c. *Prior Restraint/Chilling Effect*

[41, 42] Appellants also contend that § 5903(a)(1) imposes an impermissible prior restraint on booksellers, by forcing them to choose between censoring publications prior to their public display, or risking prosecution. We cannot agree with this "chilling effect" argument.[24] Section 5903(a)(1) is

24. Subjection to criminal liability for past conduct [§ 5903(h)], or following a hearing at which the defendant has the right to trial by jury, and the Commonwealth must prove the elements of the violation beyond a reasonable doubt [§ 5903(g)], does not constitute a prior

sufficiently specific as to provide notice of proscribed conduct. Moreover, a scienter requirement is included within the definition of the crime; the mere fact that booksellers might engage in self-censorship does not require invalidation of the statute.

> The existence of a "chilling effect," even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action ...

> ... Just as the incidental "chilling effect" of such statutes does not automatically render them unconstitutional, so the chilling effect that admittedly can result from the very existence of certain laws on the statute books does not in itself justify prohibiting the State from carrying out the important and necessary task of enforcing these laws against socially harmful conduct that the State believes in good faith to be punishable under its laws and the Constitution.

*Younger v. Harris,* 401 U.S. 37, 51–52, 91 S.Ct. 746, 754, 27 L.Ed.2d 669 (1971).

### d. Overbreadth

Appellants also maintain that compliance with the display provision will result in the denial of literary works to persons entitled to them. Thus, they assert that the amended display provision suffers from unconstitutional overbreadth. Specifically, appellants claim that extension of the variable obscenity standard from *sales* to *displays* precludes presentation to adults of literature which may constitutionally be sold to them. Without an opportunity to examine works containing explicit sexual materials before purchasing them, adults will be reduced "to reading only what is fit for children." *Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412, 414 (1957). Appellants note that "Adults only" sections could be used to apprise prospective buyers of the available selection, but contend

restraint. Thus, we review appellants' contention here as suggesting the existence of an impermissible chilling effect.

that their use would nonetheless contravene § 5903(a)(1); minors could still be admitted to commercial establishments where explicit sexual materials are displayed. Similarly, appellants assert that the display provision impermissibly infringes upon minors' First Amendment rights in that minors must necessarily be excluded from bookstores which display explicit sexual materials. The difficulty here, appellants urge, lies in the fact that minors may thereby be denied access to legitimate literary works.[25]

The trial judge concluded that, although adults may be inconvenienced in their perusal or purchase of graphic materials harmful to minors, though not obscene for adults, adult access to these materials will not be significantly impaired. In addition, Judge Marutani observed that any inhibitory effect on dissemination to adults does not render the display provision constitutionally defective, given the state's legitimate interest in shielding children from these materials. We agree.

 Initially, we reiterate that "display" within the context of § 5903(a)(1) connotes an ostentatious showing or presentation. Thus, general bookstores may lawfully carry "harmful materials" and at the same time admit minors, provided that they do not emphasize or advertise the presence of the materials therein. Although placement of these materials within an "adult books" section labeled as such may affect the type of ostentatious showing prohibited, there is, thus, no need to utilize this type of division. Furthermore, because the statute is not impermissibly vague, booksellers can reasonably ascertain, prior to displaying their merchandise, which materials are "harmful to minors." Finally, explicitly sexual materials must be knowingly displayed before a retailer will be subject to criminal

25. Appellees contend that the "denial of access to minors" argument has not been preserved for appellate review. We disagree. Although not included in appellants' Complaint in Equity, this claim was briefly asserted in the Memorandum in Support of Motion for Special and Preliminary Injunctions. Subsequently, this allegation was briefly raised at trial, and included within appellants' exceptions and the brief filed in support thereof.

prosecution. This mens rea element undermines appellants' contention that booksellers, wary of prosecution for inadvertent displays of prohibited materials, will no longer supply questionable works, thereby depriving adults of access to them. Moreover, even if booksellers, as a result of the 1980 amendments, were to remove certain titles from their collections, we would nonetheless sustain this statutory scheme.

The characteristics of a particular method of expression are relevant in delineating the permissible scope of community control. Each medium of communication presents its own particular problems and, therefore, they are not all subject to identical rules. *Joseph Burstyn Inc. v. Wilson*, 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098, 1106–1107 (1952). In general, however, determination of the question of overbreadth depends on whether the statute proscribes conduct protected by the First Amendment. Where conduct, as distinguished from mere speech, is involved, the overbreadth must be substantial in relation to the statute's legitimate sweep, before it will be invalidated. *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830, 841–842 (1973); *Commonwealth v. Stauffer*, 309 Pa.Super. 176, 454 A.2d 1140, 1144–1145 (1982). In addition, the statute must further an important or substantial government interest. Finally, incidental restrictions on First Amendment freedoms must be limited to those essential to the furtherance of that interest. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672, 680, reh. denied 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968).

The provision at issue here is not directed to "mere speech" but, rather, to the method of presentation of a form of expression which the legislature may legitimately regulate. Nor is the display restrictions's scope greater than that necessary to further the state's interest in protecting the psychological well-being of its youth; regulation of sales without control over commercial displays of materials deemed harmful to minors would render protective efforts

meaningless. Significantly, the rights of adults *and* minors to examine prohibited materials are not jeopardized. An exemption, applicable to subsection (a)(1), exists for the display of materials in charitable institutions and libraries.[26] Thus, all those interested in reading or looking through these books and magazines retain the opportunity to do so. As a clearly drawn display provision, impacting only incidentally on a storeowner's right to display and sell explicit literature harmful to minors and an adult's ability to purchase the same, § 5903(a)(1) is a valid exercise of legislative authority.

Recently, an analogous statute, assertedly overbroad, was upheld. *Freeman v. Commonwealth,* 223 Va. 301, 288 S.E.2d 461 (1982). The Virginia statute challenged there penalized, *inter alia,* the knowing distribution of sexually explicit materials whose subject was an individual under the age of 18. This proscription extended to distribution to adults of child pornography which may not have been obscene for adults. Concluding that the legislature was justified in finding that "the process of production from which the harm flows cannot effectively be curtailed unless the profit motive is contained," the Court observed,

> Whatever restriction the distribution penalties impose upon the First Amendment rights of adults who want to sell or view child pornography is merely an effect incidental to the achievement of the goal the statute pursues.

*Id.,* at 309, 288 S.E.2d at 465.

In accord, *see Dover News, Inc. v. City of Dover,* 117 N.H. 1066, 381 A.2d 752 (1977).

One appellate court has struck down, as overbroad, a statute regulating the display of this type of expression. *Calderon v. City of Buffalo,* 61 A.D.2d 323, 402 N.Y.S.2d

---

26. Section § 5903(j) provides:
 Nothing in this section shall apply to any recognized historical society or museum accorded charitable status by the Federal Government, any county, city, borough, township or town library, any public library, any library of any school, college or university or any archive or library under the supervision and control of the Commonwealth or a political subdivision.

685 (1978). In *Calderon*, however, the statute failed to define the materials proscribed in a manner similar to that upheld in *Ginsberg v. New York, supra.* The absence of any requirement that the material regulated by the provision in question be "harmful to minors" also rendered it constitutionally inadequate. Lastly, an affirmative defense available under the sales provision, for dissemination or conduct in the course of law enforcement or in bona fide scientific, educational or comparable research or study, did not apply to the display provision. Thus, the Court concluded that the challenged portion of the statute was constitutionally overbroad in that it included materials not obscene as to either adults *or* minors and thus entitled to First Amendment protection.

### e. Equal Protection

■ The Pennsylvania obscenity statute provides an exemption for non-commercial establishments. *See* 18 Pa. Cons.Stat. § 5903(j). Appellants argue that this exemption violates federal and state equal protection guarantees.[27] However, recently a panel of this Court addressed this precise issue, concluding that § 5903(j) does not violate either the Pennsylvania or United States equal protection clause. *Long v. 130 Market St. Gift & Novelty of Johnstown*, 294 Pa.Super. 383, 395, 440 A.2d 517, 523 (1982). This contention, then, is without merit.

### f. Conclusion

Appellants have not met the heavy burden borne by those challenging the constitutionality of an Act of the General Assembly. *Commonwealth v. Doe*, 316 Pa.Super. 1, 462 A.2d 762 (1983). Accordingly, the Final Decree of the Court of Common Pleas of Philadelphia County is affirmed.[28]

**27.** U.S. Const. Amend. 14, § 1; Pa. Const. Art. 1, § 1.

**28.** Given our disposition of this case, we do not reach appellants' final argument.